# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

J.M., by his Guardian *ad Litem*, Robert Welcenbach,
and ESTATE OF DONTRE HAMILTON,
by Special Administrator, Maria Hamilton

       Plaintiffs,

v.                                        Case No.:

CITY OF MILWAUKEE
and CHRISTOPHER E. MANNEY,

       Defendants.

---

## FEDERAL COMPLAINT

---

**NOW COME** the above-named Plaintiffs, by their attorneys, Samster, Konkel & Safran, S.C., Alex Flynn & Associates, S.C., and the Law Offices of Ian Wallach, P.C., and as for their causes of action against the above-named Defendants, the Plaintiffs allege and show claims for relief as follows:

## INTRODUCTION

1.      This is a federal civil rights action under the Fourth and Fourteenth Amendments to the Constitution of the United States and Title 42 of the United States Code, Section 1983. Plaintiffs bring this action to obtain compensatory damages, punitive damages, attorneys' fees, costs and equitable relief for the serious personal injuries and resulting death of Dontre Hamilton, who was unlawfully detained, unreasonably searched and then subjected to excessive force when he was shot 14 times on April 30, 2014 by Milwaukee Police Department Officer Christopher E. Manney. The conduct of Officer Manney and the constitutional violations suffered by Dontre Hamilton occurred as a direct result of the unconstitutional policies of the City of Milwaukee.

## JURISDICTION AND VENUE

### Jurisdiction

2.      This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and Title 42 of the United States Code, Section 1983. Jurisdiction of the Court is conferred by Title 28 of the United States Code, Sections 1331 and 1343(a)(3) and (4).

### Venue

3.      The Eastern District of Wisconsin is the proper federal venue for this action, pursuant to Title 28 of the United States Code, Section 1391(b), because it is judicial district where the constitutional rights violations of Dontre Hamilton were committed.

### PARTIES

4.      That Plaintiff, J.M., is a minor and the biological child of DONTRE HAMILTON, deceased. That at all times material hereto, J.M. has been residing at his address in the City of Milwaukee, State of Wisconsin, with his biological mother, Tamara Hunter. That

Plaintiff, J.M., proceeds in this action through his Court-appointed Guardian *ad Litem*, ROBERT WELCENBACH, an attorney licensed to practice law in the State of Wisconsin.

5.     That Plaintiff, ESTATE OF DONTRE HAMILTON, proceeds in this action through its Court-appointed Special Administrator, MARIA HAMILTON.

6.     That DONTRE HAMILTON was killed on April 30, 2014, and was 31 years of age at the time he was killed. That, at all times material hereto, DONTRE HAMILTON was a permanent resident in the City of Milwaukee, State of Wisconsin.

**Defendants**

7.     That Defendant, the City of Milwaukee ("MILWAUKEE"), at all times material hereto, was a municipal corporation, organized and existing under the laws of the State of Wisconsin, whose principal offices are located at City Hall, 200 East Wells Street, Room 205, City of Milwaukee, State of Wisconsin, 53202.

8.     That Defendant, Christopher E. Manney ("MANNEY"), at all times material hereto, was an adult resident of the City of Milwaukee, State of Wisconsin, and was a Milwaukee Police Department ("MPD") officer employed by MILWAUKEE. That, at all times material hereto, MANNEY was acting under color of law, was carrying out his duties as an MPD officer, and was acting within the scope of his employment with MILWAUKEE.

**FACTS**

**MILWAUKEE's Unconstitutional Policies**

9.     That there is a long, tragic history of a widespread pattern of constitutional violations committed by MPD officers.

10.     That some famous names in MILWAUKEE history, including, but not limited to, Daniel Bell, Ernest Lacy, Tandy O'Neal, Justin Fields, Curtis Harris, Frank L. Jude, Jr., Wilbert

3

Prado and Derek Williams, were victims of constitutional rights violations committed by MPD officers.

11.    That one of the latest victims of the widespread pattern of constitutional rights violations committed by MPD officers is DONTRE HAMILTON, who suffered an unlawful detention, an unreasonable search, and a fatal use of excessive force.

12.    That the moving force behind the widespread pattern of constitutional violations committed by MPD officers, including the violations suffered by DONTRE HAMILTON, are the unconstitutional policies of MILWAUKEE including: (a) the deficient hiring and retention policy; (b) the failure to train policy; (c) the failure to discipline policy; and (d) the custom of condoning constitutional rights violations.

**Deficient Hiring and Retention Policy**

13.    That the Fire and Police Commission ("FPC") is the policy-maker for MILWAUKEE with respect to the hiring of MPD officers.

14.    That, in September 1987, the Journal of Police Science and Administration, a publication of the International Association of Chiefs of Police, included an article titled "Psychological Screening of Police Candidates:  Current Perspectives."

15.    That a copy of the article titled "Psychological Screening of Police Candidates: Current Perspectives," published in the Journal of Police Science and Administration in September 1987, is attached to this Federal Complaint as Exhibit A, and is incorporated as part of this Federal Complaint.

16.    That MILWAUKEE had actual and/or constructive notice of Exhibit A and its contents in September 1987, or shortly thereafter.

4

17.     That Exhibit A contains many facts regarding the psychological testing of police officers, as will be set forth in the subsequent paragraphs.

18.     That, in 1967, the President's Commission on Law Enforcement and the Administration of Justice stated that "psychological tests . . . to determine emotional stability should be conducted in all [police] departments." (Exhibit A at p.210).

19.     That, in 1967, the National Advisory Commission on Criminal Standards and Goals stated that:

> Police officers are subject to great emotional stress and they are placed in positions of trust. For these reasons, they should be very carefully screened to preclude the employment of those who are emotionally unstable, brutal, or who suffer any form of emotional illness. A growing number of police agencies have turned to psychological screening to eliminate those who are emotionally or otherwise unfit for the police service.

(Exhibit A at p.210).

20.     That, in 1967, the National Advisory Commission on Criminal Standards and Goals issued the following recommendation: "Every police agency, by 1975, should retain the services of a qualified psychiatrist or psychologist to conduct psychological testing of police applicants to screen out those who have mental disorders or are emotionally unfit for police work." (Exhibit A at p.210).

21.     That, in 1986, International Association of Chiefs of Police President John J. Norton stated that "psychological services are now recognized as a vital component for a well-run and responsible [police] department." (Exhibit A at p.210).

22.     That, in 1977, a book titled "The Police Personnel Selection Process" stated the following:

> [L]aw enforcement agencies are under a heavy obligation to improve their techniques for detecting the high-risk applicant before hire. A high-risk applicant is one whose psychological make-up is such that he will quite likely be unable to cope with the responsibilities and authority inherent in the position of police officer. The responsibility is placed more and more directly on the

police agency to include a program of psychological testing aimed at screening-out applicants who potentially represent a risk to the public, to fellow officers, or to themselves.

(Exhibit A at p.212).

23. That, in 1983, an article titled "A process for screening out law enforcement candidates who might break under stress" stated that psychological testing of police officer applicants would screen out candidates with "such personal attributes as excessive fearfulness, phobias, uncontrolled impulsivity, inability to handle hostility, self-destructive behaviors, paranoid tendencies, and delusional thinking, as well as clearly psychotic conditions and character disorders." (Exhibit A at p.212).

24. That, in 1980, an article titled "Police officer selection in the medium-sized department" stated the following:

> [T]he psychological examination provides an excellent balance for the oral interview and polygraph examination, and is principally of value in identifying the person who is clearly not suited to police employment. This phase of testing appears to be critical in terms of negating liability where charges of negligent admission might arise as a result of misconduct of an officer following employment.

(Exhibit A at p.212).

25. That the article titled "Psychological Screening of Police Candidates: Current Perspectives" stated the following with respect to the clinical interview portion of pre-employment psychological testing of police officer candidates:

> While the information from tests and inventories is essential and tends to be more objective than other sources, there is also a need for a more individualized, in-depth method of assessing the candidate. Specific areas of concern can be probed by a professional trained in the identification of emotional and psychological difficulties. Face-to-face observation of the individual's behavior can be a valuable component when the psychologist must make critical decisions. Most psychologists feel that no candidate should be eliminated from consideration for a job

based on written psychological tests alone. The clinical interview
is a critical step in the screening process.

(Exhibit A at pp.212-213).

26.     That, on August 6, 1991, in response to citizen complaints about the MPD, then MILWAUKEE Mayor John O. Norquist announced the formation of the Mayor's Citizen Commission on Police-Community Relations to examine the performance of MPD officers.

27.     That the Mayor's Citizen Commission on Police-Community Relations issued "A Report to Mayor John O. Norquist and the Board of Fire and Police Commissioners," dated October 15, 1991.

28.     That a copy of "A Report to Mayor John O. Norquist and the Board of Fire and Police Commissioners," dated October 15, 1991, is attached to this Federal Complaint as Exhibit B, and is incorporated as part of this Federal Complaint.

29.     That MILWAUKEE had actual and/or constructive notice of Exhibit B and its contents on October 15, 1991, or shortly thereafter.

30.     That the Mayor's Citizen Commission on Police-Community Relations recommended that MILWAUKEE consider psychological testing of police officer candidates. (Exhibit B at p.30).

31.     That, in October 1994, the United States Department of Justice, National Institute of Justice, issued a Report titled "Controlling Police Use of Excessive Force:  The Role of the Police Psychologist," by Ellen M. Scrivner, Ph.D.

32.     That a copy of the United States Department of Justice, National Institute of Justice, Report titled "Controlling Police Use of Excessive Force:  The Role of the Police Psychologist," by Ellen M. Scrivner, Ph.D., dated October 1994, is attached to this Federal Complaint as Exhibit C, and is incorporated as part of this Federal Complaint.

7

33.     That MILWAUKEE had actual and/or constructive notice of Exhibit C and its contents in October 1994, or shortly thereafter.

34.     That the United States Department of Justice, National Institute of Justice, recognized that police departments have conducted psychological testing of police officer candidates since the 1980's. (Exhibit C at p.1).

35.     That the United States Department of Justice, National Institute of Justice, stated that psychological testing and clinical interviews are tools which "are valid and reliable measurements" and are "used to prevent problem behaviors, including use of excessive force." (Exhibit C at p.4).

36.     That, by no later than July 1999, MILWAUKEE's own consultant with respect to the hiring of MPD officers told the FPC that psychological testing is the only method for screening out police officer candidates who are capable of pathological or abnormal patterns of behavior.

37.     That complete psychological testing of police officer candidates consists of: (a) requiring candidates to take a written psychological test and (b) requiring candidates to participate in a clinical interview conducted by a psychologist or psychiatrist.

38.     That, prior to 2001, it was the policy of MILWAUKEE to not conduct any psychological testing of police officer candidates.

39.     That, between 2001 to 2005, it was the policy of MILWAUKEE to conduct incomplete psychological testing of police officer candidates, by requiring candidates to take a written psychological test, but not requiring candidates to participate in clinical interviews conducted by a psychologist or psychiatrist.

40.    That, starting in 2005, MILWAUKEE required police officer candidates to participate in an in-person mental health exam.

41.    That, prior to 2005, MILWAUKEE made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would preclude the employment of some candidates who were emotionally unstable, brutal and/or who suffered from emotional illness.

42.    That, prior to 2005, MILWAUKEE made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would screen out some candidates who had mental disorders and/or who were emotionally or otherwise unfit for police work.

43.    That, prior to 2005, MILWAUKEE made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would detect some candidates whose psychological make-up makes them high risk because they are unable to cope with the responsibilities and authority inherent in the position of police officer.

44.    That, prior to 2005, MILWAUKEE made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would screen out some candidates who present a risk to the public, their fellow police officers and themselves.

45.    That, prior to 2005, MILWAUKEE made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would screen out some candidates with excessive fearfulness, phobias, uncontrolled

9

impulsivity, inability to handle hostility, self-destructive behaviors, paranoid tendencies, delusional thinking, psychotic conditions and character disorders.

46.     That, prior to 2005, MILWAUKEE made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that the failure to conduct such testing could lead to liability for police officer misconduct.

47.     That, prior to 2005, MILWAUKEE made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that the National Advisory Commission on Criminal Standards and Goals recommended that every police agency, by 1975, should conduct psychological testing of police officer candidates to screen out some candidates who have mental disorders or are emotionally unfit for police work.

48.     That, prior to 2005, MILWAUKEE made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that, in 1991, the Mayor's Citizen Commission on Police-Community Relations recommended that MILWAUKEE consider psychological testing of police officer candidates.

49.     That, prior to 2005, MILWAUKEE made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that police departments had been conducting psychological testing of police officer candidates since the 1980's.

50.     That, prior to 2005, MILWAUKEE made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing is a valid and reliable measurement and is used to prevent problem behaviors by police officers, including the use of excessive force.

51.     That, prior to 2005, MILWAUKEE made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing was the only method to screen out candidates who are capable of pathological or abnormal patterns of behavior.

52.     That, prior to 2005, MILWAUKEE made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would screen out some candidates who would commit constitutional violations.

53.     That MILWAUKEE may presently fail to conduct complete psychological testing of police officer candidates.

54.     That MILWAUKEE hired MANNEY as an MPD officer on February 19, 2001.

55.     That MILWAUKEE hired MANNEY, and allowed MANNEY to remain employed with the MPD, without conducting complete psychological testing of MANNEY, despite knowing that failing to conduct complete psychological testing might result in MANNEY committing constitutional violations.

56.     That the policies of MILWAUKEE, with respect to the failure to conduct complete psychological testing of MPD officer candidates, were the moving force behind the constitutional violations suffered by DONTRE HAMILTON.

57.     That the actions and/or inactions of MANNEY during the encounter with DONTRE HAMILTON on April 30, 2014, as will be set forth in the subsequent paragraphs, show that MANNEY would have been screened out as an MPD officer candidate had MILWAUKEE conducted complete psychological testing.

58.     That, had MILWAUKEE conducted complete psychological testing on MANNEY, he would not have been hired by MILWAUKEE and/or would not have remained

employed, and, as a result, the constitutional violations suffered by DONTRE HAMILTON would not have occurred.

**Failure to Train Policy**

59.     The FPC and MPD Chief of Police are the policy-makers for MILWAUKEE with respect to the training of MPD officers.

60.     That MPD officers encountering individuals who are suffering from mental illness and/or experiencing a crisis situation are recurring situations that present an obvious potential for constitutional violations.

61.     That MPD officers dealing with intense situations involving individuals who are suffering from mental illness and/or experiencing a crisis situation are recurring situations that present an obvious potential for constitutional violations.

62.     That MPD officers using force against individuals are recurring situations that present an obvious potential for constitutional violations.

63.     That, in 2004, an MPD officer shot and killed Michael Blucher, an 18-year-old man suffering from mental illness.

64.     That the MPD officer who shot and killed Michael Blucher did not have special mental health training.

65.     That, following the shooting and killing of Michael Blucher, Memphis police administrator Sam Cochran spoke to MILWAUKEE officials regarding Crisis Intervention Team ("CIT") Training.

66.     That CIT Training courses include training on the symptoms of mental illnesses such as schizophrenia and bipolar disorder.

67.     That CIT Training is designed to help police officers recognize individuals who suffer from various mental illnesses, and understand that such individuals may not have the same initial response to commands as those who do not suffer from such illnesses.

68.     That CIT training teaches police officers about ways to de-escalate intense situations with individuals suffering with mental illness.

69.     That the cost of CIT Training is offset by the reduction in costs associated with wrongful death lawsuits, medical bills and incarceration.

70.     That, in response to Sam Cochran's presentation regarding CIT Training, a Mental Health Task Force was formed.

71.     That the Mental Health Task Force included then MPD Chief of Police Nannette Hegerty and MILWAUKEE Mayor Tom Barrett.

72.     That the Mental Health Task Force issued a report in 2004 titled "Critical Juncture, A Report to the Community from the Mental Health Task Force" ("the Critical Juncture Report").

73.     That a copy of the Critical Juncture Report is attached to this Federal Complaint as Exhibit D, and is incorporated as part of this Federal Complaint.

74.     That, in the Critical Juncture Report, the MPD promised to train 1,800 MPD officers, which is more than 90% of all sworn officers, on "strategies for working with persons with mental illness." (Exhibit D at p.15).

75.     That, in the Critical Juncture Report, the MPD promised to provide 1,800 MPD officers with mental health training because the officers respond to "a high number of incidents involving persons with mental illness experiencing crisis situations." (Exhibit D at p.15).

76.     That, in the Critical Juncture Report, the MPD promised to provide 1,800 MPD officers with mental health training because officers with such training will have "greater understanding and skills" and "will have an immediate, positive impact on how crisis situations were managed." (Exhibit D at p.15).

77.     That the MPD has failed in its promise to train 1,800 MPD officers with mental health training.

78.     That, as of 2014, the MPD had provided only 367 MPD officers with mental health training.

79.     That MILWAUKEE failed to provide MANNEY with CIT Training.

80.     That CIT Training would have helped a police officer such as MANNEY recognize DONTRE HAMILTON as an individual who suffered from mental illness.

81.     That CIT Training would have helped a police officer such as MANNEY understand that DONTRE HAMILTON may not have had the same response to MANNEY's commands as an individual who did not suffer from mental illness.

82.     That CIT Training would have helped a police officer such as MANNEY understand that DONTRE HAMILTON may have been experiencing a crisis situation.

83.     That CIT Training would have helped a police officer such as MANNEY de-escalate the intense situation with DONTRE HAMILTON.

84.     That MILWAUKEE also failed to train MANNEY that the use of force must be rational to the threat of harm.

85.     That MILWAUKEE also failed to train MANNEY on the proper use of a gun in response to a minimal threat of harm.

86.     That, prior to April 30, 2014, and continuing to the present, it was/is the policy of MILWAUKEE to have a training program that was/is not adequate to train MPD officers to properly encounter individuals who are suffering from mental illness and/or experiencing a crisis situation and to properly use force against individuals because the program fails to: (a) provide CIT Training; (b) train that the use of force must be rational to the threat of harm; and (c) train on the proper use of a gun in response to a minimal threat of harm.

87.     That, as will be set forth in the subsequent paragraphs, MANNEY improperly responded to his encounter with DONTRE HAMILTON, an individual suffering from mental illness, by unlawfully detaining him and unreasonably conducting a pat-down search of his person.

88.     That, as will be set forth in the subsequent paragraphs, MANNEY failed to de-escalate an intense situation with DONTRE HAMILTON.

89.     That, as will be set forth in the subsequent paragraphs, MANNEY improperly responded to the minimal threat of harm associated with DONTRE HAMILTON by using the excessive force of firing 14 gun shots into him.

90.     That the policies of MILWAUKEE with respect to failure to train MPD officers, as set forth in the preceding paragraphs, were the moving force behind the constitutional violations suffered by DONTRE HAMILTON.

91.     That, had MILWAUKEE provided CIT Training to MPD officers, including MANNEY, and trained MPD officers, including MANNEY, to properly use force, the constitutional violations suffered by DONTRE HAMILTON would not have occurred.

**Failure to Discipline Policy**

92.     That the FPC and MPD Chief of Police are the policy-makers for MILWAUKEE with respect to the discipline of MPD officers.

93.     That MILWAUKEE has a long history of failing to discipline its police officers for misconduct, including, but not limited to, the commission of constitutional rights violations.

94.      That, in 1991, the Mayor's Citizen Commission on Police-Community Relations identified significant problems with the FPC citizen complaint process, which resulted in only one police officer being disciplined between 1985 and 1990. (Exhibit B at pp.35-38).

95.     That MILWAUKEE took no action to address the problems with the FPC citizen complaint process identified by the Mayor's Citizen Commission on Police-Community Relations in 1991.

96.     That, in June 2006, the Police Assessment Resource Center and Richard Jerome, PC issued a Report titled "Promoting Police Accountability in Milwaukee: Strengthening the Fire and Police Commission" ("the PARC Report"), which details the problems with the FPC citizen complaint process.

97.     That a copy of the PARC Report is attached to this Federal Complaint at Exhibit E, and is incorporated as part of this Federal Complaint.

98.     That MILWAUKEE had actual and/or constructive notice of the PARC Report and its contents by June 2006, or shortly thereafter.

99.     That the PARC Report stated that "one of the goals of police oversight is to go beyond the review of individual citizen complaints to assess trends or patterns of police

misconduct, as well as to address community concerns about police policies and practices." (Exhibit E at p.67).

100. That the PARC Report concluded that "[t]he FPC citizen complaint process is broken beyond repair and further stated that "[t]he FPC complaint process is structurally flawed in ways that make it very difficult for a citizen to establish a claim of misconduct, even if meritorious." (Exhibit E at p.46).

101. That the PARC Report also stated that the results of the FPC citizen complaint process "are troubling, and demonstrate the FPC's structural defects" and further indicated that, out of the 550 complaints filed from 1992 to 1999, only six cases resulted in sustained charges against only eight MPD officers. (Exhibit E at p.49).

102. That the PARC Report indicated that, out of the 437 complaints filed from 2000 to 2005, charges were sustained against only two MPD officers. (Exhibit E at p.49).

103. That the PARC Report found that the FPC has failed to use its power and fulfill its responsibility to conduct policy reviews of the MPD and stated that, "[w]hile the [FPC] has responsibility for policy review, it has not established a program of systematic monitoring or auditing of the MPD, analysis and study of MPD policies and procedures, or of trends in complaints or the MPD use of force." (Exhibit E at pp.68, 73).

104. That the PARC Report found that the FPC performed "[n]o audits of FPC citizen complaints, nor any audit or evaluation of complaints received and investigated by MPD." (Exhibit E at p.73).

105. That the PARC Report found that the FPC performed "[l]imited collection and analysis of MPD use of force information, or evaluation of MPD's efforts to analyze its own

use of force statistics" and that the FPC performed "[n]o review of civil actions and tort claims relating to MPD actions." (Exhibit E at p.74).

106. That the PARC Report made several recommendations for the FPC to utilize its policy review and oversight functions and recommended significant changes in the procedures for addressing citizen complaints against MPD officers. (Exhibit E at pp.50-56, 75-76).

107. That, prior to April 30, 2014 and continuing to the present, it was/is the policy of MILWAUKEE to fail to properly investigate citizen complaints against MPD officers.

108. That, prior to April 30, 2014 and continuing to the present, it was/is the policy of MILWAUKEE to fail to properly investigate uses of force by MPD officers.

109. That, prior to April 30, 2014 and continuing to the present, it was/is the policy of MILWAUKEE to permit a belief among MPD officers that they can commit constitutional rights violations without ever facing consequences for their misconduct.

110. That the policies of MILWAUKEE with respect to its failures to discipline MPD officers, as set forth in the preceding paragraphs, were the moving force behind the constitutional violations suffered by DONTRE HAMILTON.

111. That MILWAUKEE had actual and/or constructive notice that MPD officers were unlawfully detaining individuals prior to April 30, 2014.

112. That, despite having actual and/or constructive notice that MPD officers were unlawfully detaining individuals, MILWAUKEE took no action to discipline the MPD officers involved.

113. That, as a result of MILWAUKEE's failure to discipline the MPD officers involved in unlawfully detaining individuals, MILWAUKEE allowed the unlawful detentions to continue, including the unlawful detention suffered by DONTRE HAMILTON.

114.    That MILWAUKEE had actual and/or constructive notice that MPD officers were unreasonably searching individuals prior to April 30, 2014.

115.    That, despite having actual and/or constructive notice that MPD officers were unreasonably searching individuals, MILWAUKEE took no action to discipline the MPD officers involved.

116.    That, as a result of MILWAUKEE's failure to discipline the MPD officers involved in unreasonably searching individuals, MILWAUKEE allowed the unreasonable searches to continue, including the unreasonable pat-down search suffered by DONTRE HAMILTON.

117.    That MILWAUKEE had actual and/or constructive notice that MPD officers were using excessive force against individuals prior to April 30, 2014.

118.    That, despite having actual and/or constructive notice that MPD officers were using excessive force against individuals, MILWAUKEE took no action to discipline the MPD officers involved.

119.    That, as a result of MILWAUKEE's failure to discipline the MPD officers involved in using excessive force against individuals, MILWAUKEE allowed the uses of excessive force to continue, including the use of excessive force suffered by DONTRE HAMILTON.

120.    That MANNEY unlawfully detained, unreasonably searched, and used excessive force against DONTRE HAMILTON because, prior to April 30, 2014, other MPD officers had not been disciplined for similar misconduct.

121.    That, if MILWAUKEE had not failed to discipline MPD officers for unlawful detentions, unreasonable searches and uses of excessive force, the unlawful detention,

unreasonable search and the use of excessive force suffered by DONTRE HAMILTON would not have happened.

122. That MILWAUKEE presently maintains a policy of failing to discipline MPD officers for engaging in misconduct, including, but not limited to, unlawful detentions, unreasonable searches and uses of excessive force.

### Custom of Condoning Constitutional Rights Violations

123. That, prior to April 30, 2014 and continuing to the present, MILWAUKEE maintained/maintains a custom of condoning constitutional rights violations by MPD officers.

124. That this custom of condoning constitutional rights violations by MPD officers was/is so persistent and widespread that it was/is the official policy of MILWAUKEE.

125. That, prior to April 30, 2014, MILWAUKEE had actual and/or constructive notice of the custom of condoning constitutional rights violations by MPD officers.

126. That part of MILWAUKEE's custom of condoning constitutional rights violations by MPD officers was/is the failure to discipline MPD officers for misconduct, as set forth in the preceding paragraphs.

127. That part of MILWAUKEE's custom of condoning constitutional rights violations by MPD officers was/is the "code of silence" that exists within the MPD, even though this code may be contrary to the express policies of MILWAUKEE.

128. That the MPD's "code of silence" is where MPD officers do not report the misconduct of their fellow officers due to the fear of retaliation.

129. That, in 1991, the Mayor's Citizen Commission on Police-Community Relations identified the MPD's "code of silence." (Exhibit B at pp.21-22).

130.     That MILWAUKEE took insufficient action in response to the Mayor's Citizen Commission on Police-Community Relations identifying the MPD's "code of silence."

131.     That, on October 24, 2004, several MPD officers brutally beat and tortured Frank L. Jude, Jr. ("the Jude incident").

132.     That, during the MPD investigation into the Jude incident, former MPD Chief of Police Nannette Hegerty expressed frustration that MPD officers were following the "code of silence" by refusing to cooperate with the MPD investigation.

133.     That, during the state criminal investigation into the Jude incident, former Milwaukee County District Attorney E. Michael McCann stated that the MPD's "code of silence" hampered the investigation.

134.     That the MPD's "code of silence" required the request and order for a John Doe proceeding so that MPD officers could be compelled to testify regarding their knowledge of the Jude incident.

135.     That, when MPD Officer Nicole Belmore came forward to report the misconduct of her fellow officers during the Jude incident, thereby violating the MPD's "code of silence," Officer Belmore suffered retaliation by MPD officers, including, but not limited to: (a) MPD officers calling Officer Belmore a "rat;" (b) MPD officers vandalizing Officer Belmore's property; (c) MPD officers interfering with Officer Belmore's police radio communications; and (d) MPD officers refusing to provide back-up to Officer Belmore when it was requested.

136.     That, despite having actual and/or constructive notice of the retaliation suffered by MPD Officer Nicole Belmore, MILWAUKEE took no action to investigate the retaliation or to discipline the MPD officers involved in the retaliation.

137.     That then MPD Officer Bradley Blum followed the "code of silence" when he refused to answer questions regarding his knowledge of the Jude incident during a May 13, 2009 deposition in *Frank L. Jude, Jr. v City of Milwaukee, et al.*, United States District Court for the Eastern District of Wisconsin Case Number 06-CV-1101 ("the Jude civil case").

138.     That, despite then MPD Officer Bradley Blum following the "code of silence" and refusing to answer questions during his deposition in the Jude civil case, MILWAUKEE has taken no action against Mr. Blum and instead has promoted him to the rank of Sergeant.

139.     That several MPD officers, including then MPD Officer Richard Ticcioni, followed the "code of silence" by refusing to testify during the Inquest into the police custody death of Derek Williams.

140.     That, despite then MPD Officer Richard Ticcioni following the "code of silence" and refusing to answer questions during the Inquest into the police custody death of Derek Williams, MILWAUKEE has promoted Mr. Ticcioni to the rank of Detective.

141.     That several other MPD officers have followed the "code of silence" by refusing to testify in various other civil and criminal proceedings.

142.     That MILWAUKEE has taken no action with respect to any MPD officer following the "code of silence" by refusing to testify in a civil or criminal proceeding.

143.     That, in 2011 and 2012, when two MPD officers violated the "code of silence" by reporting the misconduct of a fellow police officer, the MPD retaliated against the two officers in the terms and conditions of their employment.

144.     That, in 2009, MPD Chief of Police Edward A. Flynn ("FLYNN") admitted that the "code of silence" exists within the MPD.

145.     That the "code of silence" presently exists within the MPD and is currently the custom and policy of MILWAUKEE.

146.     That part of MILWAUKEE's custom of condoning constitutional rights violations by MPD officers is the concept of "noble cause corruption" that exists within the MPD, even though this concept may be contrary to the express policies of MILWAUKEE.

147.     That the concept of "noble cause corruption" is where MPD officers engage in misconduct because they believe they are accomplishing a greater good.

148.     That, in 2012, FLYNN admitted that the concept of "noble cause corruption" exists within the MPD.

149.     That MILWAUKEE's custom of condoning constitutional rights violations by MPD officers was the moving force behind the constitutional violations suffered by DONTRE HAMILTON.

150.     The constitutional violations suffered by DONTRE HAMILTON happened because MANNEY's fellow MPD officers had followed the "code of silence" by not reporting prior misconduct.

151.     That the constitutional violations suffered by DONTRE HAMILTON happened because MANNEY was following the concept of "noble cause corruption," engaging in unlawful detentions, unreasonable searches and uses of excessive force, because he believed that such actions would serve the greater good of the community.

152.     That, had MILWAUKEE not maintained a custom of condoning constitutional violations, the constitutional violations suffered by DONTRE HAMILTON would not have occurred.

**Widespread Pattern of Constitutional Violations**

153. That there is a long history of constitutional violations committed by MPD officers that were caused by the policies and customs of MILWAUKEE. That the constitutional violations include, but are not limited to, the events listed below.

154. That, in 1958, MPD Officer Thomas Grady planted a knife on Daniel Bell to support his false claim that Mr. Bell was armed and attacked him.

155. That MPD Officer Louis Krause followed the MPD's "code of silence" by conspiring with MPD Officer Thomas Grady to lie about the incident which led to the fatal shooting of Daniel Bell.

156. That, between 1979 and 1980, the United States Department of Justice ("DOJ") conducted an investigation into a possible pattern of misconduct within the MPD.

157. That former MPD Chief of Police Harold Brier refused to cooperate with the DOJ investigation.

158. That the DOJ investigation found that 22 people died in MPD custody between 1975 and 1979.

159. That the DOJ investigation ultimately determined that there was no accountability for former MPD Chief of Police Harold Brier.

160. That, in 1981, Ernest Lacy died in MPD custody after MPD officers used excessive force against him and then failed to provide him with medical assistance.

161. That, despite a medical examiner documenting over 30 cuts and bruises on Ernest Lacy's body, and witnesses' accounts describing MPD officer use of excessive force against Mr. Lacy, former MPD Chief of Police Harold Brier claimed that MPD officers did nothing wrong during the incident that resulted in the death of Mr. Lacy.

162. That former MPD Chief of Police Harold Brier refused to cooperate with any federal investigation into the death of Ernest Lacy.

163. That, in 1988, MPD officers shot Tandy O'Neal in the back, rendering Mr. O'Neal a quadriplegic.

164. That a MPD Detective, following the MPD's "code of silence," initially stated that Tandy O'Neal struggled with MPD officers prior to being shot.

165. That the MPD Detective eventually admitted that his statement regarding Tandy O'Neal struggling with MPD officers was not true.

166. That, in 2003, MPD Officer Craig Nawotka shot and killed Justin Fields.

167. That MPD Officer Craig Nawotka shot Justin Fields in the back as Mr. Fields was slowly driving away from MPD officers.

168. That MPD Sergeant Harold Hampton, who conducted the MPD internal investigation into MPD Officer Craig Nawotka's shooting of Justin Fields, testified under oath that the head of the MPD internal affairs division ignored Sergeant Hampton's findings that Officer Nawotka violated several MPD rules during the incident that resulted in the shooting of Mr. Fields.

169. That MILWAUKEE settled a civil rights action filed by the family of Justin Fields for $1.6 million.

170. That, in 2003, MPD Officer Kevin Clark slammed Curtis Harris' head into the wall and floor of the MPD District 3 Police Station booking room.

171. That, as a result of MPD Officer Kevin Clark's actions, Curtis Harris was rendered a quadriplegic.

172.     That MPD Officer Kevin Clark claimed that Curtis Harris was trying to hit him, but video from the incident refuted Officer Clark's claim.

173.     That MILWAUKEE settled a federal civil rights action filed by Curtis Harris for $3 million.

174.     That MILWAUKEE took no action against MPD Officer Kevin Clark for his actions during the incident with Curtis Harris.

175.     That MPD Officer Kevin Clark was later fired from the MPD after he pleaded guilty to insurance fraud after collecting worker's compensation benefits for injuries he sustained while sledding on duty.

176.     That MPD Officer Kevin Clark and other MPD officers followed the MPD's "code of silence" by covering up the sledding while on duty incident.

177.     That, although they initially denied any involvement in the Jude incident, several MPD officers ultimately pleaded guilty in federal court to violating Frank L. Jude, Jr.'s constitutional rights.

178.     That, following a federal criminal trial, a jury determined that several other MPD officers violated Frank L. Jude, Jr.'s constitutional rights.

179.     That  MILWAUKEE settled Frank L. Jude, Jr.'s federal civil rights action for $2 million.

180.     In March 2005, MPD Officer Alfonzo Glover shot and killed Wilbert Prado.

181.     That, following the trial on the Prado family's federal civil rights action, a jury determined that MPD Officer Alfonzo Glover violated Wilbert Prado's constitutional rights.

182.     That MIILWAUKEE ultimately settled the Prado family's federal civil rights action.

183.   That, in 2012, MPD Sergeant Jason Mucha was reassigned after multiple complaints of invasive body cavity searches.

184.   That, within a three-year time period, Sergeant Mucha was accused at least ten times of using excessive force and/or planting drugs on citizens.

185.   That, in August 2005, the Milwaukee County Circuit Court, the Honorable Charles F. Kahn, Jr. presiding, ruled that several persons who had accused Sergeant Mucha of using excessive force could testify in a criminal case where the defendant accused Sergeant Mucha of using excessive force. (*State of Wisconsin v. Lemar Barnes*, Milwaukee County Case Number 04-CF-1001, Amended Decision of Admissibility of Evidence, dated August 10, 2005).

186.   That, on March 14, 2006, the Court of Appeals of Wisconsin issued an opinion reversing a trial court decision that denied a criminal defendant's request to introduce evidence that Sergeant Mucha had used excessive force and/or planted drugs on other persons. (*State of Wisconsin v. Walter T. Missouri*, 2006 WI App 74).

187.   That, between 2000 and 2007, the MPD investigated Sergeant Mucha for seven battery complaints, four unreasonable search complaints, two theft complaints and one false arrest complaint.

188.   That the MPD claimed that all the complaints against Sergeant Mucha set forth in the preceding paragraph were either unfounded or unsubstantiated.

189.   That the MPD either failed to notice or intentionally disregarded a pattern and/or trend with respect to Sergeant Mucha's misconduct.

190.   That, on July 6, 2011, Derek Williams died in MPD custody after MPD officers may have used excessive force against Mr. Williams and then failed to provide Mr. Williams

with medical assistance, despite the fact that Mr. Williams was in the back seat of an MPD squad car struggling to breathe and begging MPD officers for help.

191. That an Inquest was held to determine whether any of the MPD officers involved should face criminal charges as a result of the death of Derek Williams.

192. That, following the conclusion of testimony, the Derek Williams Inquest jury issued an advisory verdict that MPD Officers Richard Ticcioni, Jason Bleichwehl and Jeffrey Cline should be criminally charged pursuant to Wisconsin Statute Section 940.291, Law Enforcement Officer; Failure to Render Aid.

193. That, despite the Derek Williams Inquest jury's advisory verdict, the special prosecutor who conducted the Inquest refused to bring criminal charges against Officers Ticcioni, Bleichwehl and Cline.

194. That MILWAUKEE took no action against Officers Ticcioni, Bleichwehl, Cline, or any other MPD officers involved in the death of Derek Williams.

195. That, on September 22, 2011, MPD Officer Richard Schoen used excessive force against a woman in his custody by punching her in the face multiple times, grabbing her by the hair as he removed her from an MPD squad car, and kneeing her in the stomach.

196. That the MPD fired Officer Schoen as a result of his actions on September 22, 2011.

197. That the FPC then reversed the MPD's decision to fire Officer Schoen and instead gave him his job back, suspending him for 60 days.

198. That, following a public outcry, the FPC reinstated the MPD's decision to fire Officer Schoen.

199.    That, in 2013, a jury determined that MPD Detective Rodolfo Gomez either intentionally, or with reckless disregard for the truth, made false or misleading statements in an affidavit accompanying a search warrant application, awarding the victim of Detective Gomez's misconduct $1,000,000. (*Richard Betker v. Rodolfo Gomez*, United States District Court for the Eastern District of the United States Case Number 08-CV-760, Verdict Form dated November 20, 2013).

200.    That, from approximately 2008 to 2012, several MPD officers conducted illegal pat-down searches, illegal strip searches and illegal body cavity searches of numerous individuals.

201.    That over 70 individuals alleged federal civil rights claims against the MPD officers for the illegal pat-down searches, illegal strip searches and illegal body cavity searches.

202.    That MILWAUKEE settled the individuals' federal civil rights claims involving the illegal pat-down searches, illegal strip searches and illegal body cavity searches for $5 million.

## The Killing of Dontre Hamilton on April 30, 2014

203.    That, in the early to mid-afternoon of April 30, 2014, DONTRE HAMILTON, was lawfully relaxing and possibly sleeping in Red Arrow Park in downtown Milwaukee.

204.    That DONTRE HAMILTON was relaxing and possibly sleeping near a Starbuck's coffee shop, temporarily located in a trailer in Red Arrow Park.

205.    That, at approximately 1:52 PM, an employee of Starbuck's contacted the MPD regarding DONTRE HAMILTON.

Case 2:16-cv-00507-JPS   Filed 04/27/16   Page 29 of 46   Document 1

206. That, in response, MPD Officer Keith Cameron called MANNEY on his cell phone to check on DONTRE HAMILTON.

207. That MANNEY did not answer his cell phone when Officer Cameron called.

208. That Officer Cameron left a voice mail message on MANNEY's cell phone.

209. That, because MANNEY did not answer his cell phone, the request to check on DONTE HAMILTON was given to an MPD dispatcher.

210. That, at approximately 1:54 PM, the MPD dispatcher contacted MPD Officer Robert A. Fitchett and MPD Officer Andrew T. Fuerte to conduct a "welfare check" of DONTRE HAMILTON.

211. That a "welfare check" dispatch is a check into the well-being of an individual, as opposed to a "trouble with subject" dispatch, which is an investigation of an individual who is disorderly, unruly and/or creating a disturbance.

212. That Officer Fitchett and Officer Fuerte arrived at Red Arrow Park to conduct the "welfare check" of DONTRE HAMILTON.

213. That Officer Fitchett requested a name and identification from DONTRE HAMILTON.

214. That DONTRE HAMILTON provided his name and proper identification to Officer Fitchett.

215. That Officer Fuerte determined that DONTRE HAMILTON was not intoxicated.

216. That Officer Fitchett asked DONTRE HAMILTON if he needed medical attention.

217. That DONTRE HAMILTON told Officer Fitchett that he was fine and did not need anything.

218. That Officer Fuerte ran DONTRE HAMILTON's name through an MPD computer, but there was nothing in the computer that required additional action by the MPD officers.

219. That Officer Fitchett and Officer Fuerte determined that DONTRE HAMILTON was not doing anything wrong or unlawful, and could therefore remain in Red Arrow Park.

220. That DONTRE HAMILTON cooperated with Officer Fitchett and Officer Fuerte.

221. That Officer Fitchett and Officer Fuerte left Red Arrow Park.

222. That, at approximately 2:09 PM, a Starbucks' employee made another call to the MPD regarding DONTRE HAMILTON.

223. That Officer Fitchett and Officer Fuerte returned to Red Arrow Park.

224. That Officer Fitchett and Officer Fuerte again spoke to DONTRE HAMILTON.

225. That Officer Fitchett and Officer Fuerte again determined that there was nothing wrong with DONTRE HAMILTON, and that he was not doing anything wrong or unlawful.

226. That Officer Fitchett and Officer Fuerte informed the staff at Starbuck's that DONTRE HAMILTON was not disturbing anyone, was not doing anything wrong or unlawful, and could therefore remain in Red Arrow Park.

227. That Officer Fitchett and Officer Fuerte again left Red Arrow Park.

228. That, at approximately 3:28 PM, MANNEY listened to the voice mail message on his cell phone regarding DONTRE HAMILTON.

229. That MANNEY contacted MPD dispatch to see if there were any pending assignments relating to Red Arrow Park.

230. That MPD dispatch told MANNEY that there were no pending assignments at Red Arrow Park.

231.    That, despite being told that there were no pending assignments at Red Arrow Park, MANNEY requested that MPD dispatch record him as responding to the Park for a "trouble with suspect."

232.    That MANNEY classified his response to Red Arrow Park as a "trouble with subject," despite the fact that DONTRE HAMILTON was not acting disorderly and/or unruly, and was not creating a disturbance.

233.    That, when MANNEY arrived at Red Arrow Park, he observed DONTRE HAMILTON lying on his back on the ground.

234.    That, when MANNEY arrived at Red Arrow Park, DONTRE HAMILTON was not committing, had not committed, and was not about to commit a crime.

235.    That, when MANNEY arrived at Red Arrow Park, DONTRE HAMILTON was not armed and was not a danger to MANNEY or to anyone else.

236.    That MANNEY approached DONTE HAMILTON, who was still lying on his back on the ground.

237.    That, when DONTRE HAMILTON was lying on the ground, MANNEY was in a position of tactical advantage.

238.    That, without legal justification, MANNEY ordered DONTRE HAMILTON to stand up.

239.    That DONTRE HAMILTON complied with MANNEY's order to stand up.

240.    That, when DONTRE HAMILTON was standing, MANNEY was in a position of tactical disadvantage.

241.    That, without reasonable suspicion that DONTRE HAMILTON was armed and/or dangerous, MANNEY initiated physical contact with DONTRE HAMILTON by beginning to conduct a pat-down search.

242.    That a "pat-down search," also known as a "frisk," is an intrusive practice where an individual is detained and a police officer feels over the individual's body and clothes to determine if there are weapons present.

243.    That an MPD officer may detain an individual only if the officer has reasonable suspicion that the individual is committing, has committed, or is about to commit a crime.

244.    That an MPD officer may conduct a pat-down search of an individual only if the officer has reasonable suspicion that the individual is armed and that the officer or someone else is in danger from the individual.

245.    That, at the time MANNEY detained DONTRE HAMILTON, there was no reason for MANNEY to suspect that DONTRE HAMILTON was committing, had committed, or was about to commit a crime.

246.    That, at the time MANNEY began the pat-down search of DONTRE HAMILTON, there was no reason for MANNEY to suspect that DONTRE HAMILTON was armed or that MANNEY or anyone else was in danger from DONTRE HAMILTON.

247.    That, at some point during MANNEY's pat-down search of DONTRE HAMILTON, an altercation ensued between MANNEY and DONTRE HAMILTON.

248.    That, during the altercation, MANNEY used his police baton to strike DONTRE HAMILTON.

249.    That, during the altercation, DONTRE HAMILTON obtained possession of MANNEY's police baton.

250. That MANNEY retreated and then turned and faced DONTRE HAMILTON.

251. That, during the altercation, MANNEY removed his gun from its holster.

252. That, as MANNEY backed away from DONTRE HAMILTON, he fired 14 shots into the body of DONTRE HAMILTON, resulting in 21 gunshot wounds.

253. That MANNEY believed he only fired 5 shots at DONTRE HAMILTON, when in fact he fired 14 shots.

254. That, prior to shooting DONTRE HAMILTON, MANNEY said "so, you want to fight."

255. That MANNEY may have kept shooting after DONTRE HAMILTON was on the ground.

256. That one bullet fired by MANNEY entered the back of DONTRE HAMILTON.

257. That, as a result of MANNEY's actions, DONTRE HAMILTON died on April 30, 2014.

258. That a toxicology report established that DONTRE HAMILTON had no drugs or alcohol in his system on April 30, 2014.

259. That, on October 15, 2014, FLYNN issued a personnel order discharging MANNEY from the MPD because of his illegal pat-down search of DONTRE HAMILTON.

260. That MANNEY appealed his discharge from the MPD to the FPC.

261. That, during MANNEY's appeal to the FPC, FLYNN testified that MANNEY did not have the reasonable suspicion required to conduct a pat-down search of DONTRE HAMILTON.

262.    That, during MANNEY's appeal to the FPC, FLYNN testified that MANNEY's illegal pat-down search "instigated a physical confrontation that resulted in a deadly use of force."

263.    That the FPC determined that MANNEY did not have reasonable suspicion that DONTRE HAMILTON had weapons and posed a threat to MANNEY's or another person's safety.

264.    That the FPC issued a decision upholding FLYNN's discharge of MANNEY from the MPD. That a copy of the FPC decision is attached to this Federal Complaint as Exhibit F, and is incorporated as part of this Federal Complaint.

265.    That MANNEY has appealed the FPC decision to the Milwaukee County Circuit Court.

266.    That, at the time of the filing of this Federal Complaint, MANNEY's appeal of the FPC decision is pending.

267.    That, had MANNEY not conducted the unlawful detention, DONTRE HAMILTON would not have died on April 30, 2014.

268.    That, had MANNEY not conducted the unreasonable pat-down search, DONTRE HAMILTON would not have died on April 30, 2014.

269.    That, had MILWAUKEE provided MANNEY with CIT training, he would not have conducted the unlawful detention and pat-down search, and DONTRE HAMILTON would not have died on April 30, 2014.

270.    That, had MANNEY not used excessive force by shooting 14 times, DONTRE HAMILTON would not have died on April 30, 2014.

271.    That the actions and/or inactions of MANNEY on April 30, 2014 involved reckless and/or callous indifference to the federally protected rights of DONTRE HAMILTON.

272.    That MANNEY claims that he suffers from mental illness as a result of killing DONTRE HAMILTON.

273.    That, only two days prior to his discharge from the MPD, MANNEY filed a claim for duty disability pay as a result of his mental illness.

274.    That MILWAUKEE's Annuity and Pension Board approved MANNEY's duty disability claim.

275.    That, despite being fired from the MPD, MANNEY will receive approximately 75% of his MPD salary in duty disability pay, tax-free, so long as he is determined to be disabled.

### The MPD's Unlawful Investigation into the Killing of Dontre Hamilton

276.    That, on April 23, 2014, Wisconsin Assembly Bill 409, commonly known as "the Michael Bell law," came into law as Wisconsin Statute Section 175.47.

277.    That Michael Bell, Jr. had been killed by Kenosha Police Department ("KPD") officers.

278.    That the KPD quickly determined, without conducting any substantive investigation, that the officers did not act improperly in killing Michael Bell, Jr.

279.    That the Michael Bell law requires that investigations of police officer-involved deaths are conducted by at least two investigators, both of whom must be employed by an outside agency.

280.    That the Michael Bell law forbids a police department from conducting the investigation when an officer from the department is involved in an individual's death.

281.    That, on April 30, 2014, one week after the enactment of the Michael Bell law, MANNEY killed DONTRE HAMILTON.

282.    Despite MILWAUKEE's knowledge that it would be contrary to the Michael Bell law for the MPD to conduct the investigation of MANNEY'S killing of DONTRE HAMILTON, the MPD conducted essentially the entire investigation.

283.    That the MPD may have conducted the interviews of every witness in the investigation.

284.    That the MPD may have determined who to interview, who not to interview, and which witness statements were relevant to the investigation.

285.    That the MPD may have taken all the photographs of the scene at Red Arrow Park.

286.    That the MPD's investigation into the killing of DONTRE HAMILTON by MANNEY was in direct violation of the Michael Bell law.

287.    That, in response to MILWAUKEE's violation of the Michael Bell law during the investigation into the killing of DONTRE HAMILTON by MANNEY, Wisconsin legislators proposed changes to the law to ensure that future investigations into police officer-involved deaths are truly conducted by independent, outside investigators.

## CAUSES OF ACTION

### First Cause of Action
### Title 42, United States Code, Section 1983
### Unlawful Detention against MANNEY

288.    Plaintiffs re-allege, and incorporate by reference, the allegations of the preceding paragraphs.

289.    That DONTRE HAMILTON had a constitutionally protected right not to be unlawfully detained.

290.    That, as set forth in the preceding paragraphs, MANNEY unlawfully detained DONTRE HAMILTON.

291.    That MANNEY intentionally unlawfully detained DONTRE HAMILTON.

292.    That MANNEY acted under color of law.

293.    That MANNEY's unlawful detention resulted in the death of DONTRE HAMILTON.

## Second Cause of Action
## Title 42, United States Code, Section 1983
## Unreasonable Search against MANNEY

294.    Plaintiffs re-allege, and incorporate by reference, the allegations of the preceding paragraphs.

295.    That DONTRE HAMILTON had a constitutionally protected right to be free from unreasonable searches.

296.    That, as set forth in the preceding paragraphs, MANNEY deprived DONTRE HAMILTON of his constitutionally protected right to be free from unreasonable searches.

297.    That MANNEY intentionally caused the deprivation of DONTRE HAMILTON's right to be free from unreasonable searches.

298.    That MANNEY acted under color of law.

299.    That MANNEY's unreasonable search resulted in the death of DONTRE HAMILTON.

### Third Claim for Relief
### Title 42, United States Code, Section 1983
### Excessive Force against MANNEY

300.     Plaintiffs re-allege, and incorporate by reference, the allegations of the preceding paragraphs.

301.     That DONTRE HAMILTON had a constitutionally protected right not to have excessive force used against him.

302.     That, as set forth in the preceding paragraphs, MANNEY used excessive force against DONTRE HAMILTON.

303.     That MANNEY intentionally used excessive force against DONTRE HAMILTON.

304.     That MANNEY acted under color of law.

305.     That MANNEY's use of excessive force resulted in the death of DONTRE HAMILTON.

### Fourth Claim for Relief
### Title 42, United States Code, Section 1983
### Loss of Society and Companionship against MANNEY

306.     Plaintiffs re-allege, and incorporate by reference, the allegations of the preceding paragraphs.

307.     That the conduct of MANNEY, as set forth in the preceding paragraphs, which resulted in the death of DONTRE HAMILTON, deprived J.M of the society and companionship of his father.

**Fifth Claim for Relief**
**Wisconsin Statute Section 895.46**
**Indemnification against MILWAUKEE**

308.    Plaintiffs re-allege, and incorporate by reference, the allegations in the preceding paragraphs.

309.    That, at all times material hereto, MANNEY was carrying out his duties as an MPD officer, and was acting within the scope of his employment with MILWAUKEE.

310.    That the conduct of MANNEY, as set forth in the preceding paragraphs, resulted in the death of DONTRE HAMILTON.

311.    That MILWAUKEE is liable, pursuant to Wisconsin Statute Section 895.46, for any judgment entered against MANNEY in this action because, at all times material hereto, MANNEY was carrying out his duties as an MPD officer, and was acting within the scope of his employment with MILWAUKEE.

**Sixth Claim for Relief**
**Title 42, United States Code, Section 1983**
**Deficient Hiring and Continued Employment Policy against MILWAUKEE**

312.    Plaintiffs re-allege, and incorporate by reference, the allegations in the preceding paragraphs.

313.    That, at all material times hereto, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

314.    That, prior to 2005, MILWAUKEE had an official policy with respect to the hiring and continued employment of MPD officers.

315.    That, prior to 2005, the policy-makers of MILWAUKEE made a conscious choice from various alternatives to follow its official policy with respect to the hiring and continued employment of MPD officers.

316.     That, prior to 2005, MILWAUKEE's official policy with respect to the hiring and continued employment of MPD officers was deficient in that it did not include administration of complete psychological testing of police officer candidates.

317.     That, prior to 2005, the policy-makers of MILWAUKEE permitted the hiring of certain MPD officers, even though complete psychological testing would lead an objectively reasonable policy-maker to conclude, as set forth in the preceding paragraphs, that said police officers would be highly likely to deprive third parties of their constitutional rights, including, but not limited to:  (a) the right not to be unlawfully detained; (b) the right to be free from unreasonable searches; and (c) the right to be free from the use of excessive force.

318.     That, prior to 2005 and continuing to the present, the policy-makers of MILWAUKEE permitted/permit the continued employment of certain MPD officers, even though complete psychological testing would lead an objectively reasonable policy-maker to conclude, as set forth in the preceding paragraphs, that said police officers would be highly likely to deprive third parties of their constitutional rights, including, but not limited to:  (a) the right not to be unlawfully detained; (b) the right to be free from unreasonable searches; and (c) the right to be free from the use of excessive force.

319.     That the policy-makers of MILWAUKEE knew or should have known that, as set forth in the preceding paragraphs, complete psychological testing of police officer candidates was needed to avoid highly likely deprivations of constitutional rights, including, but not limited to:  (a) the right not to be unlawfully detained; (b) the right to be free from unreasonable searches; and (c) the right to be free from the use of excessive force.

320.     That MILWAUKEE's deficient policy with respect to the hiring and continued employment of MPD officers caused the violation of the DONTRE HAMILTON's

constitutional rights, and the injuries and damages to the Plaintiffs, as set forth in the preceding paragraphs.

321.    That MILWAUKEE's official policy with respect to the hiring of MPD officers may be currently deficient in that it does not include administration of complete psychological testing of police officer candidates.

**Seventh Claim for Relief**
**Title 42, United States Code, Section 1983**
**Failure to Train Policy against MILWAUKEE**

322.    Plaintiffs re-allege, and incorporate by reference, the allegations in the preceding paragraphs.

323.    That, at all relevant times herein, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

324.    That, prior to April 30, 2014 and continuing to the present, the policy-makers of MILWAUKEE made/make a conscious choice from various alternatives to follow its official policies with respect to the training of MPD officers.

325.    That, as set forth in the preceding paragraphs, prior to April 30, 2014 and continuing to the present, MILWAUKEE's official policies with respect to the training of MPD officers were/are inadequate with respect to the recurring situations of encountering individuals with mental illness and using force against individuals.

326.    That, prior to April 30, 2014 and continuing to the present, the policy-makers of MILWAUKEE knew or should have known that more and/or different training of MPD officers with respect to:  (a) encountering individuals who are suffering from mental illness and/or experiencing a crisis situation; (b) dealing with intense situations involving individuals who are suffering from mental illness and/or experiencing a crisis situation; and (c) using force

against individuals was/is needed to avoid likely unlawful detentions, unreasonable searches, and uses of excessive force; and/or that this was/is plainly obvious to the policy-makers of MILWAUKEE.

327. That MILWAUKEE's failure to provide adequate training to MPD officers caused the violations of DONTRE HAMILTON's constitutional rights, and the injuries and damages to the Plaintiffs, as set forth in the preceding paragraphs.

328. That MILWAUKEE's official policies with respect to the training of MPD officers are currently inadequate with respect to the recurring situations of encountering individuals with mental illness and using force against individuals.

**Eighth Claim for Relief**
**Title 42, United States Code, Section 1983**
**Failure to Discipline Policy against MILWAUKEE**

329. Plaintiffs re-allege, and incorporate by reference, the allegations in the preceding paragraphs.

330. That, at all relevant times herein, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

331. That, prior to April 30, 2014 and continuing to the present, the policy-makers of MILWAUKEE made/make a conscious choice from various alternatives to follow its official policies with respect to the discipline of MPD officers.

332. That, as set forth in the preceding paragraphs, prior to April 30, 2014 and continuing to the present, MILWAUKEE's official policies with respect to the discipline of MPD officers were/are inadequate with respect to the recurring situations of unlawful detentions, unreasonable searches, and uses of excessive force.

333.    That, prior to April 30, 2014 and continuing to the present, the policy-makers of MILWAUKEE knew or should have known that more and/or different policies with respect to the discipline of MPD officers was/is needed to avoid likely unlawful detentions, unreasonable searches, and uses of excessive force; and/or that this was/is plainly obvious to the policy-makers of MILWAUKEE.

334.    That MILWAUKEE's failure to discipline MPD officers caused the violations of DONTRE HAMILTON's constitutional rights, and the injuries and damages to the Plaintiffs, as set forth in the preceding paragraphs.

335.    That MILWAUKEE's official policies with respect to the discipline of MPD officers are currently inadequate with respect to the recurring situations of unlawful detentions, unreasonable searches, and uses of excessive force.

### Ninth Claim for Relief
### Title 42, United States Code, Section 1983
### Custom of Condoning Constitutional Rights Violations against MILWAUKEE

336.    Plaintiffs re-allege, and incorporate by reference, the allegations in the preceding paragraphs.

337.    That, at all relevant times herein, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

338.    That the actions and/or inactions of MANNEY in unlawfully detaining, unreasonably searching, and using excessive force against DONTRE HAMILTON were done in accordance with MILWAUKEE's custom of condoning constitutional rights violations.

339.    That MILWAUKEE's custom of condoning constitutional rights violations was/is so persistent and widespread, as set forth in the preceding paragraphs, that it was/is MILWAUKEE's official policy.

340. That MILWAUKEE's custom of condoning constitutional rights violations permitted, encouraged, tolerated or ratified the actions and/or inactions of MANNEY, all in malicious or reckless disregard or with deliberate indifference regarding the constitutional rights of DONTRE HAMILTON.

341. That the policy-makers of MILWAUKEE made/make a conscious choice from various alternatives to follow its custom of condoning constitutional rights violations.

342. That the policy-makers of MILWAUKEE acted with deliberate indifference to the consequences of its custom of condoning constitutional rights violations.

343. That MILWAUKEE's custom of condoning constitutional rights violations caused the violations of DONTRE HAMILTON's constitutional rights, and the injuries and damages to the Plaintiffs, as set forth in the preceding paragraphs.

## DEMAND FOR JUDGMENT

344. Wherefore, the Plaintiffs demand judgment against the Defendants as follows:

    a. In favor of the Plaintiffs and against MANNEY and MILWAUKEE, as set forth in the preceding paragraphs, jointly and severally, for compensatory and special damages;

    b. In favor of the Plaintiffs and against MANNEY, as set forth in the preceding paragraphs, for punitive damages;

    c. In favor of the Plaintiffs and against MILWAUKEE, as set forth in preceding paragraphs, for its liability pursuant to Wisconsin Statute Section 895.46;

    d. For injunctive and other equitable relief reforming the policies and customs of MILWAUKEE, to prevent like actions and harms in the future; and

e.  For all costs, disbursements, interest and reasonable attorneys' fees pursuant to Title 42 of the United States Code, Section 1988, and for such other relief as the Court deems just and equitable.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL OF THIS ACTION ON ALL ISSUES SO TRIABLE.**

> */s/Jonathan S. Safran*
> Jonathan S. Safran
> Wisconsin State Bar No.:  1000881
> Jerome A. Konkel
> Wisconsin State Bar No.:  1000149
> Jeffrey D. Patza
> Wisconsin State Bar No.:  1030512
> SAMSTER, KONKEL, & SAFRAN, S.C.
> Attorneys for Plaintiffs
> 1110 North Old World Third Street, Suite 405
> Milwaukee, WI 53203
> Phone: (414)224-0400
> E-mail:  jsafran@skslawyers.com
> Email:  jkonkel@skslawyers.com
> Email:  jpatza@skslawyers.com
>
> Alex Flynn
> Wisconsin State Bar No.:  1015056
> ALEX FLYNN & ASSOCIATES, S.C.
> Attorneys for Plaintiffs
> 1223 North Prospect Avenue
> Milwaukee, WI 53202
> Phone: (414) 276-7400
> E-mail:alex@alexflynn.com
>
> Ian Wallach
> California State Bar No.:  237849
> Law Offices of Ian Wallach, P.C.
> Attorneys for Plaintiffs
> 6080 Center Drive, Suite 600
> Los Angeles, CA 90045
> Phone: (213)375-0000
> E-mail:  iwallach@wallachlegal.com

Date:   April 27, 2016.