# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

J.M., et al.,

       Plaintiffs,

v.                                      Case No.: 16-CV-507

CITY OF MILWAUKEE, et al.,

       Defendants.

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

## INTRODUCTION

By moving for summary judgment in this action, the Defendants claim that there are no genuine disputes of material fact pertaining to the incident between Defendant, Christopher E. Manney, ("Manney") and Dontre Hamilton in Red Arrow Park on April 30, 2014. In support of this claim, the Defendants rely solely upon the version of the facts set forth in the Affidavit of Manney, the Milwaukee Police Department ("MPD") officer who detained, searched and ultimately shot and killed Mr. Hamilton. The Defendants make no arguments addressing the significant inconsistencies between the version of the facts set forth in Manney's Affidavit and his own prior actions and statements. In addition, the Defendants make no arguments addressing the numerous witness statements that contradict the version of the facts set forth in Manney's Affidavit. By failing to make these arguments in their initial brief, the Defendants have waived any such arguments. The Court

should not consider any such arguments made for the first time in the Defendants' reply brief.

As will be set forth in detail below, a reasonable jury could find for the Plaintiffs' on all their claims. There are also numerous disputes of material fact pertaining to the incident between Manney and Dontre Hamilton in Red Arrow Park on April 30, 2014. The Court should therefore deny the Defendants' motion for summary judgment.

## FACTS

Please see the Plaintiffs' Response to the Defendants' Proposed Findings of Fact ("RPFF") and the Plaintiffs' Statement of Additional Facts ("SAF") for a complete statement of the facts that support the Plaintiffs' opposition to the Defendants' motion for summary judgment. The facts set forth in the RPFF and the SAF demonstrate that a reasonable jury could find in favor of the Plaintiffs on all their claims. In addition, the facts set forth in the RPFF and the SAF establish that there are numerous disputes of material fact pertaining to the incident between Manney and Dontre Hamilton in Red Arrow Park on April 30, 2014. Either way, the facts set forth in the RPFF and the SAF should preclude summary judgment in favor of the Defendants.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the moving party demonstrates that there are no genuine disputes of material fact. Fed. R. Civ. P. 56(a). If there is sufficient evidence so that a reasonable jury could issue a verdict for the non-

moving party, summary judgment is inappropriate. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). In deciding a motion for summary judgment, the Court must construe the facts in the light most favorable to the non-moving party. *Payne*, 337 F.3d at 770.

To decide a summary judgment motion in a police excessive force case where the victim is deceased, the Court cannot simply accept an account of the facts from the police officer. *Flythe v. District of Columbia*, 791 F.3d 13, 19 (D.C. Cir. 2015). In such cases, the Court cannot just accept the police officer's version because the person most likely to contradict the police officer's story – the victim of the excessive force – is deceased. *Flythe*, 791 F.3d at 19. Instead, the Court must carefully examine all the evidence, to decide if the police officer's account "is internally consistent and consistent with other known facts." *Id.*

It is also important to note that, when a party brings a motion for summary judgment, any argument not raised in the initial brief in support of the motion is waived. *Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011). The Court should not consider arguments raised for the first time in a reply brief. *Hernandez*, 634 F.3d at 913, n.9.

Application of the summary judgment standard to this action shows why the Defendants' motion should be denied. To begin with, the facts construed in the light most favorable to the Plaintiffs demonstrate that a reasonable jury could find for the Plaintiffs on all claims. Moreover, there are several material disputes of fact which preclude summary judgment. Furthermore, the Court should not simply

accept Manney's version of events as set forth in his Affidavit because the person most likely to dispute Manney's version – Dontre Hamilton – is deceased. Instead, the Court should consider the fact that Manney's Affidavit is contradicted by his own prior statements and actions, and by numerous witness accounts. The Defendants' initial brief fails to present any arguments addressing the contradictions to Manney's Affidavit or the contradictory witness accounts. This failure results in a waiver of any such arguments that the Defendants cannot redeem in their reply brief.

## ARGUMENT

### I. Summary Judgment is Inappropriate on the Plaintiffs' Unlawful Detention Claim.

A police officer may lawfully detain a person under the Fourth Amendment if the officer has reasonable suspicion that the person has committed or is about to commit a crime. *U.S. v.* Uribe, 709 F.3d 646, 649-650 (7th Cir. 2013) (*citing Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).

#### A. A reasonable jury could find that Manney unlawfully detained Dontre Hamilton.

##### 1. It is undisputed that Manney detained Dontre Hamilton.

When Manney approached Dontre Hamilton in Red Arrow Park, Manney ordered Mr. Hamilton to stand up. (RPFF No. 48). Manney has admitted that Mr. Hamilton had no choice but to obey his order. (Id.). Manney has also admitted that, when he ordered Mr. Hamilton to stand up, he was detaining Mr. Hamilton. (SAF No. 1).

> 2. Manney did not have reasonable suspicion that Dontre Hamilton had committed or was about to commit a crime.

The Defendants attempt to justify Manney's detention of Dontre Hamilton by arguing that Manney had reason to believe that Mr. Hamilton was engaged in some kind of unlawful activity, such as disorderly or otherwise unlawful conduct. (Defendants' Brief at pp.28-30). The facts contradict the Defendants' argument.

> a. Manney has admitted that he had no knowledge that Dontre Hamilton had committed or was about to commit a crime.

The Defendants claim that Manney had reasonable suspicion that Dontre Hamilton had committed or was about to commit a crime because Manney knew that the Starbucks' employees would only call for police service if "something unlawful was afoot." (Defendants' Brief at p.28-29). There are two problems with this claim. First, the Starbucks' employee who called the MPD about Mr. Hamilton did not call for police service, because she did not request that an MPD officer come to Red Arrow Park. (RPFF No. 7). Second, Manney's generalized speculation as to why Starbucks' employees allegedly called for police service has nothing to do with the individual circumstances pertaining to Mr. Hamilton, and therefore cannot be considered in the determination of whether Manney's detention was lawful. *See Edmond v. Goldsmith*, 183 F.3d 659, 662 (7th Cir. 1999).

Contrary to Manney's generalized speculation, he knew exactly why the Starbucks' employee called the MPD. Former MPD Officer Keith Cameron ("Cameron") left a voicemail for Manney stating that the Starbucks' employee reported that a homeless person may have been sleeping in Red Arrow Park.

(RPFF No. 33). Cameron's voicemail was the only knowledge Manney had regarding Dontre Hamilton's activities prior to his arrival at the park. (Id.).

Manney has acknowledged that there was nothing in Cameron's voicemail message stating that the Starbucks' employee was complaining about Dontre Hamilton engaging in disorderly conduct or any other unlawful activity. (RPFF No. 33). Thus, Manney has admitted that he did not have reasonable suspicion that Mr. Hamilton had committed or was about to commit a crime when he detained Mr. Hamilton.

> b. The Court should reject any argument in the Defendants' reply brief that Manney lawfully detained Dontre Hamilton because he was allegedly sleeping in Red Arrow Park.

To begin with, the Defendants did not argue in their initial brief that Manney's detention of Dontre Hamilton was lawful because Manney had reasonable suspicion that Mr. Hamilton was asleep in Red Arrow Park. (Defendants' Brief at pp.26-30). By failing to raise the argument in their initial brief, the Defendants have waived any such argument. *See Hernandez*, 634 F.3d at 913.

Moreover, Manney did not have reasonable suspicion that Dontre Hamilton was asleep when he detained Mr. Hamilton. Manney has admitted that he did not know whether Mr. Hamilton was sleeping, but made the assumption based solely upon the fact that Mr. Hamilton's eyes were closed. (RPFF No. 23). In addition, Manney saw that Mr. Hamilton's left knee was bent upward and twitching in an erratic pattern, which suggests that Mr. Hamilton was not asleep. (RPFF No. 24). Manney has also stated that, as he quietly approached Mr. Hamilton, he opened his

eyes when Manney was still three or four feet away. (Defendants' Proposed Finding of Fact ("PFF") No. 36). Because Mr. Hamilton opened his eyes prior to Manney detaining him, demonstrating that he was in fact awake, Manney did not have reasonable suspicion that Mr. Hamilton was asleep.

Even if Manney had reasonable suspicion that Dontre Hamilton was asleep or had been sleeping in Red Arrow Park, Manney did not have reasonable suspicion of a crime. Milwaukee County Ordinance 47.25 prohibits sleeping in county parks. The penalty for violating Milwaukee County Ordinance 47.25 is a forfeiture. Milwaukee County Ordinance 47.29(1). Under Wisconsin law, conduct punishable only by a forfeiture is not a crime. Wis. Stat. § 939.12. Accordingly, even if Mr. Hamilton had been sleeping in the park, he was not committing a crime. *See* id.

B. There is a dispute of material fact as to whether Manney detained Dontre Hamilton to check on his welfare.

The Defendants also attempt to justify Manney's detention of Dontre Hamilton by arguing that Manney detained Mr. Hamilton to check on his welfare. (Defendants' Brief at pp.29-30). This argument is contradicted by Manney's prior statements and actions.

1. Manney did not go to Red Arrow Park to check on Dontre Hamilton's welfare.

Despite having no knowledge that Dontre Hamilton was causing any trouble in Red Arrow Park, Manney categorized his response to Mr. Hamilton as a "trouble with subject." (RPFF No. 13). Manney likely assumed that Mr. Hamilton was causing trouble because there is evidence that Manney may be biased against

homeless people. The voicemail message from Cameron to Manney identified Mr. Hamilton as a homeless person. (RPFF No. 13). Starbucks' employee Jennifer Kramer ("Kraemer") Manney heard Manney say something like all homeless people are alcoholics and do not want to be helped. (SAF No. 2).

Manney had a chance to characterize his response to Dontre Hamilton as a "welfare check" call, but he chose not to. Manney has acknowledged that a police response to someone passed out in car is a "welfare check" call. (RPFF No. 13). Despite this acknowledgement, Manney characterized his response to Mr. Hamilton, who was only allegedly sleeping in a park, as a "trouble with subject" call. (Id.).

> ## 2. Manney went to Red Arrow Park as a police officer assuming that Dontre Hamilton had committed crimes.

Prior to arriving at Red Arrow Park, Manney assumed that Dontre Hamilton was engaged in some kind of unlawful activity such as disorderly conduct. (PFF Nos. 12 and 13). Manney made this assumption even though he had no knowledge of Mr. Hamilton engaging in such activity. (RPFF Nos. 12 and 13). Consistent with his assumption that Mr. Hamilton was engaged in an unlawful activity, Manney approached Mr. Hamilton as a criminal suspect. (SAF No. 3). Instead of checking on Mr. Hamilton's welfare, Manney ordered Mr. Hamilton to stand up and began a pat-down search of Mr. Hamilton. (RPFF Nos. 48 and 68).

Because a reasonable jury could find that Manney detained Dontre Hamilton without reasonable suspicion that Mr. Hamilton had committed or was about to commit a crime, and because there is a dispute of material fact as to whether

Manney detained Mr. Hamilton to check on his welfare, the Court should deny the Defendants' motion for summary judgment on the Plaintiffs' unlawful detention claim.

## II. Summary Judgment is Inappropriate on the Plaintiffs' Unreasonable Search Claim.

To conduct a pat-down search of a person consistent with the Fourth Amendment, a police officer must have reasonable suspicion that the person is both armed and dangerous. *U.S. v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013) (citing *Terry*, 392 U.S. at 27).

### A. A reasonable jury could find that Manney conducted an unreasonable pat-down search of Dontre Hamilton.

The Defendants have moved for summary judgment on the Plaintiffs' unreasonable search claim, despite the fact that the two policy-makers for Defendant, City of Milwaukee, ("the City") with respect to the discipline of MPD officers have already concluded that Manney conducted an unreasonable pat-down search of Dontre Hamilton.

The City has admitted that MPD Chief of Police Edward A. Flynn ("Flynn") is a policy-maker for the City with respect to the discipline of MPD officers. (SAF No. 4). Flynn issued a Complaint against Manney for his misdeeds during the incident with Dontre Hamilton in Red Arrow Park on April 30, 2014. (SAF No. 5). Flynn has stated that the Complaint is a true and accurate description of the charges against Manney and the factual allegations that supported Flynn's discipline of Manney. (SAF No. 6). In the Complaint, Flynn determined that Manney "failed to have

9

reasonable suspicion that Mr. Hamilton was armed with a weapon and posed a threat to him or others prior to conducting a pat-down search . . . ." (SAF No. 7). In addition, Flynn determined that Manney did not have an individualized suspicion of Mr. Hamilton prior to conducting the pat-down search. (SAF No. 8). Instead, Manney only had a generalized suspicion. (Id.). The generalized suspicion to which Flynn was referring was Manney's conclusion that Mr. Hamilton was a homeless person. (SAF No. 9). As a result of Manney's failure to have reasonable suspicion that Mr. Hamilton was armed and dangerous prior to conducting the pat-down search, and for other misdeeds during the incident with Mr. Hamilton, Flynn fired Manney from the MPD. (SAF No. 10).

Manney appealed his firing from the MPD to the City of Milwaukee Fire and Police Commission ("FPC"). (SAF No. 11). The City has admitted that the FPC is a policy-maker for the City with respect to the discipline of MPD officers. (SAF No. 12). The FPC conducted a hearing on Manney's appeal of his discharge from the MPD, which took place from March 19, 2015 to March 23, 2015. (SAF No. 13). Following the hearing, the FPC upheld Flynn's decision to fire Manney from the MPD because Manney failed to have reasonable suspicion prior to conducting the pat-down search of Dontre Hamilton. (SAF No. 14).

B. There are numerous disputes of material fact pertaining to Manney's pat-down search of Dontre Hamilton.

Manney's Affidavit sets forth his latest version of the events surrounding his pat-down search of Dontre Hamilton. The problem for Manney is that his latest version is contradicted by his own prior statements.

1. There is a dispute of material fact as to whether Manney actually conducted a pat-down search of Dontre Hamilton.

In their Proposed Findings of Fact, the Defendants seem to be claiming that Manney did not conduct a pat-down search of Dontre Hamilton, but instead that Manney touched Mr. Hamilton's body to gain additional information and/or to build a rapport. (PFF Nos. 67-73). In their brief, the Defendants seem to contradict this claim, stating that "the frisk of Mr. Hamilton did not begin until Officer Manney placed his hands on Mr. Hamilton's torso . . .." (Defendants' Brief at p.33).

Contrary to the Defendants' attempt to cloud the issue, Manney's prior statements confirm that he conducted a pat-down search of Dontre Hamilton. On April 30, 2014, Manney gave "a detailed statement" regarding the incident involving Mr. Hamilton at the Police Administration Bureau ("PAB"). (RPFF No. 51). Manney claims to have told the truth at the PAB. (Id.). While at the PAB, Manney stated that he conducted a pat-down search of Mr. Hamilton. (RPFF No. 68). In addition, Manney never denied conducting a pat-down search of Mr. Hamilton in response to the charge, issued by Flynn, that he failed to have reasonable suspicion to conduct the pat-down search of Mr. Hamilton. (RPFF No. 68). Manney cannot identify any time that he denied conducting a pat-down search of Mr. Hamilton prior to any denial contained in his Affidavit. (RPFF No. 68).

2. There are disputes of material fact regarding Manney's alleged justifications for conducting the pat-down search of Dontre Hamilton.

a. There is a dispute of material fact as to why the Starbuck's employee called the MPD about Dontre Hamilton.

The Defendants argue that Manney's pat-down search of Dontre Hamilton was justified by the fact that Starbucks' employees had previously requested police response to deal with "disorderly people and panhandling vagrants." (Defendants' Brief at p.32). This argument should fail for two reasons. First, the Defendants' claims about prior instances of Starbucks' employees requesting police assistance for disorderly people and panhandling vagrants has nothing to do with the individual circumstances involving Manney and Mr. Hamilton, and is therefore irrelevant to whether Manney had reasonable suspicion to conduct a pat-down search of Mr. Hamilton. *See Edmond*, 183 F.3d at 662. Second, the Defendants' attempt to paint Mr. Hamilton as either a disorderly person or a panhandling vagrant who disturbed the Starbucks' employees enough to request police service is contradicted by the facts. As stated above, Manney knew exactly why the Starbuck's employee called the MPD, which was to report that a homeless person may have been sleeping in Red Arrow Park. (RPFF No. 33). Manney has admitted that he had no knowledge about Mr. Hamilton allegedly engaged in disorderly conduct or panhandling. (Id.). In addition, the Starbucks' employee who called the MPD did not request that an MPD officer come to the park. (Id.).

> b. There is a dispute of material fact as to whether Manney saw bulges in Dontre Hamilton's pockets.

The Defendants argue that Manney's pat-down search of Dontre Hamilton was justified based upon Manney's claim that he saw bulges in Mr. Hamilton's pockets. (Defendants' Brief at pp.32-33). Plaintiffs' dispute Manney's claim about allegedly observing bulges in Mr. Hamilton's pockets, because this claim has evolved over time. Manney never claimed that he observed bulges in Dontre Hamilton's pockets during his April 30, 2014 detailed statement at the PAB. (RPFF No. 62). During his August 27, 2014 interview with MPD Internal Affairs investigators, Manney was asked about the alleged bulges he saw in Mr. Hamilton's pockets. (Id.). MPD Sergeant Christopher Schroeder asked Manney what he thought the bulges were. (Id.). Manney responded: "Unknown . . . they could be anything." (Id.). When Manney testified at the FPC hearing regarding his appeal of his firing from the MPD, Manney was asked the following question: "The bulges you are noticing could be like a knit cap or a handkerchief or a newspaper. You don't know what it is. Right?" Manney responded: "Exactly . . .." (Id.). In his Affidavit, Manney now claims that the alleged bulges in Mr. Hamilton's front pockets were consistent with a box cutter or some other type of bladed weapon. (Id.).

Thus, Manney's claim about allegedly seeing bulges in Dontre Hamilton's front pockets has evolved over time from: (a) Manney not stating that he saw bulges; to (b) Manney denying any knowledge of what the alleged bulges were; to (c) Manney claiming that the alleged bulges were consistent with a box cutter or other type of bladed weapon.

13

The Defendants try to support Manney's claim of alleging seeing bulges in Dontre Hamilton's pockets by claiming that homeless people often carry bladed weapons for self-protection. (Defendants' Brief at pp.32-33). The Defendants' generalized assumption about homeless people is irrelevant to whether Manney had reasonable suspicion to conduct a pat-down search of Mr. Hamilton. *See Edmond*, 183 F.3d at 662.

       3. There is a dispute of material fact as to whether Dontre Hamilton consented to Manney's pat-down search.

The Defendants also argue that Dontre Hamilton consented to the pat-down search. (Defendants' Brief at pp.33-34). The facts do not support this argument. According to the Defendants, Mr. Hamilton consented to Manney's pat-down search, because he raised his arms in an airplane-like position in a non-verbal communication of consent. (Defendants' Brief at p.33). Manney's prior statements contradict this claim. Specifically, during his April 30, 2014 detailed statement at the PAB, Manney stated that he reached under Dontre Hamilton's arms and then lifted Mr. Hamilton's arms upwards. (RPFF No. 66). Manney did not claim that Mr. Hamilton consented to a pat-down search during his April 30, 2014 detailed statement at the PAB. (Id.). Also, Manney has admitted that he never asked Mr. Hamilton whether he consented to a pat-down search, and that Mr. Hamilton never told Manney that he consented to a pat-down search. (Id.).

In his Affidavit, which is dated January 31, 2017, Manney for the first time Manney claims that Dontre Hamilton consented to the pat-down search. (RPFF No. 66). Manney was interviewed twice by MPD Internal Affairs investigators, once on

July 30, 2014 and again on August 27, 2014. (Id.). In neither interview did Manney claim that Mr. Hamilton consented to the pat-down search. (Id.). In addition, Manney never claimed that Mr. Hamilton consented to the pat-down search in his response to Flynn's charge that he failed to have reasonable suspicion to conduct a pat-down search of Mr. Hamilton. (Id.). Also, during his appeal of his firing to the FPC, Manney never testified that Mr. Hamilton consented to the pat-down search. (Id.). Finally, Manney also admitted that he cannot identify any time prior to his Affidavit when he claimed that Mr. Hamilton consented to the pat-down search. (Id.).

Because a reasonable jury could agree with Flynn and the FPC and find that Manney conducted an unreasonable pat-down search of Dontre Hamilton without reasonable suspicion that Mr. Hamilton was armed and dangerous, and because there are disputes of material fact pertaining to Manney's pat-down search of Mr. Hamilton, the Court should deny the Defendants' motion for summary judgment on the Plaintiffs' unreasonable search claim.

III.    **Summary Judgment is Inappropriate on the Plaintiffs' Excessive Force Claim.**

Pursuant to the Fourth Amendment's prohibition of unreasonable seizures, a police officer's use of deadly force must be reasonable. *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003) (citing *Tennessee v. Garner*, 471 U.S. 1, 7, (1985)). In a situation where a police officer could be justified in shooting someone, the officer "does not retain the right to shoot at any time thereafter with impunity." *Scott*, 346

F.3d at 757. Once the threat to the police officer ceases, the legality of the use of deadly force ceases as well. *Id.*

> ### A. A reasonable jury could find that Manney used excessive force against Dontre Hamilton.

Even assuming for the sake of argument that Manney was justified in firing his gun at Dontre Hamilton, the facts show that Manney kept shooting after any threat posed by Mr. Hamilton ceased.

> #### 1. Manney cannot account for Dontre Hamilton's location or actions during the entire shooting.

At the time of the April 30, 2014 incident with Dontre Hamilton, Manney believed that he fired five gunshots at Mr. Hamilton. (RPFF No. 121). Manney now admits that he in fact fired 13 or 14 gunshots at Mr. Hamilton. (Id.). Manney also does not remember firing all 13 or 14 gunshots at Mr. Hamilton. (Id.). Manney therefore cannot accurately account for Mr. Hamilton's actions during the entire shooting, because Manney cannot account for or even remember 8 or 9 of the gunshots that he fired at Mr. Hamilton. (Id.).

> #### 2. There are several witnesses who either saw or heard Manney shoot at Dontre Hamilton after any threat presented by Mr. Hamilton had ceased.

Numerous witnesses saw or heard Manney shoot at Dontre Hamilton after Mr. Hamilton was either on the ground or falling to the ground. Brad Hoeschen heard gunshots as Mr. Hamilton was falling to the ground, and heard the last shot as Mr. Hamilton made contact with the ground. (RPFF No. 122). Kathy Leppla ("Leppla") saw Manney shoot at Mr. Hamilton while Mr. Hamilton was on the

ground, approximately 10 feet away from Manney. (Id.). After witnessing Manney shoot Mr. Hamilton while he was on the ground, Leppla exclaimed something to the effect: "Stop! Why is he shooting at him? He is on the ground!" (Id.). Mary Maier ("Maier") heard Leppla yell: "Why is he still shooting?" (Id.). Maier also heard the gunshots, and then looked out her office window and saw Mr. Hamilton on the ground. (Id.). Maier then heard another two or three gunshots. (Id.). Larry McKenzie II ("McKenzie") saw Manney continuing to fire gunshots at Mr. Hamilton even though Mr. Hamilton was falling to the ground. (Id.). Karega Lee heard gunshots after seeing that Mr. Hamilton was on the ground. (Id.). Ebony Rochelle Morgan saw Manney standing over Mr. Hamilton while firing two gunshots at Mr. Hamilton who was on the ground. (Id.). Te John Neal saw Manney fire one gunshot at Mr. Hamilton while Mr. Hamilton was lying on the ground. (Id.).

In addition to witness testimony, physical evidence supports the conclusion that Manney shot Dontre Hamilton while Mr. Hamilton was either falling to the ground or on the ground. Dr. Wieslawa Tlomak performed the autopsy of Mr. Hamilton. (RPFF No. 122). According to Dr. Tlomak, seven of the gunshots fired by Manney were fired in a downward trajectory. (Id).

Several witnesses also saw Manney keep shooting at Dontre Hamilton even though Mr. Hamilton was not moving towards Manney and/or had dropped the baton. McKenzie saw, after the first two gunshots fired by Manney, that Mr. Hamilton started turning side-to-side, hugging his body with his arms, and dropped the wooden baton. (RPFF No. 122). McKenzie also saw Manney fire an additional

Case 2:16-cv-00507-JPS  Filed 03/03/17  Page 17 of 31  Document 58

six to eight gunshots at Mr. Hamilton, even though Mr. Hamilton had dropped the baton and was not moving towards Manney. (Id.). Pamela Thomas ("Thomas") saw Manney keep shooting at Mr. Hamilton, even though Mr. Hamilton had dropped the baton and had placed his hands across his chest in a defensive position. (RPFF No. 123). In response to Manney's actions, Thomas screamed: "Why is he still shooting him? Why doesn't he stop?" (Id.). Thomas also saw Manney keep shooting at Mr. Hamilton after the first two or three gunshots, even though Mr. Hamilton was not moving towards Manney. (Id.). Susan Ford ("Ford") did not see Mr. Hamilton move towards Manney at any time after Manney started shooting at Mr. Hamilton. (RPFF No. 121).

The fact that Manney used excessive force against Dontre Hamilton is supported by Flynn's deposition testimony in this action. Flynn testified that, if a person is advancing on a police officer with a weapon that could cause grievous injury, the officer can shoot at the person and keep shooting until the person stops advancing. (SAF No. 15). Thus, even assuming for the sake of argument that Mr. Hamilton had advanced on Manney with the wooden baton, Manney used excessive force when he kept shooting after Mr. Hamilton stopped advancing. (*See* id.).

> B. There are several disputes of material fact pertaining to Manney's use of force against Dontre Hamilton.

The Defendants argue that Dontre Hamilton was the aggressor during the incident with Manney. (Defendants' Brief at pp.35-36). On the contrary, the facts demonstrate that it was Manney who was the aggressor and who escalated the incident from the beginning by: (1) placing his hands on Mr. Hamilton to conduct a

pat-down search; (2) striking Mr. Hamilton with his fists; (3) introducing the wooden baton into the incident and striking Mr. Hamilton with the baton; and (4) introducing the gun into the incident and fatally shooting Mr. Hamilton.

       1.   There is no dispute that Manney initiated the physical contact with Dontre Hamilton.

Flynn determined that, when Manney placed his hands on Dontre Hamilton to conduct a pat-down search, Manney initiated the physical contact with Mr. Hamilton. (SAF No. 16). Manney agrees with Flynn that Mr. Hamilton did not touch him until he placed his hands on Mr. Hamilton. (SAF No. 17). Flynn also determined that, prior to Manney placing his hands on Mr. Hamilton and beginning the pat-down search, Mr. Hamilton had not engaged in any type of violence and had not threatened any type of violence against Manney or anyone else. (SAF No. 18). The Defendants agree that, prior to Manney placing his hands on Mr. Hamilton's body, "Mr. Hamilton did not exhibit any sign of violent behavior . . .." (PFF Nos. 70 and 71).

       2.   There is a dispute as to whether Dontre Hamilton advanced on Manney with clenched fists.

Contrary to the Defendants' claim that Dontre Hamilton advanced towards Manney with clenched fists after Manney freed his arms from Mr. Hamilton's body, two witnesses to the incident saw Manney chasing Mr. Hamilton. McKenzie saw Manney chasing Mr. Hamilton around the ice rink area of the park. (RPFF No. 84). McKenzie saw Mr. Hamilton running in circles, like in a figure eight, as if he was a kid playing a game of keep away. (Id.). Consistent with what McKenzie saw,

Thomas saw Manney chasing Mr. Hamilton, who was running in Red Arrow Park like a kid playing a game. (Id.).

> 3. There is a dispute as to whether Dontre Hamilton punched Manney in the head and jaw, and whether Mr. Hamilton hit Manney with the wooden baton in the head.

The Defendants contend that Dontre Hamilton punched Manney several times in the head and jaw, and also struck Manney in the head several times with the wooden baton. (Defendants' Brief at p.36). Manney's statements and appearance on April 30, 2014 contradict this contention. To begin with, **{REDACTED}.** (RPFF No. 93). Moreover, **{REDACTED}.** (Id.).

Witnesses also dispute the Defendants' claims about Dontre Hamilton punching or striking Manney in the head. Thomas did not see Mr. Hamilton hit, kick or do anything to Manney prior to Manney striking Mr. Hamilton with the baton. (RPFF No. 93). According to Thomas, Mr. Hamilton had simply stopped running away from Manney when Manney began striking him with the baton. (Id.). McKenzie saw Mr. Hamilton swing the wooden baton towards Manney, but not actually strike Manney with the wooden baton. (Id.). Kelly Brandmeyer ("Brandmeyer") saw Mr. Hamilton swing the police baton once at Manney's hands, in a defensive move to block Manney's hands, but did not actually strike Manney. (SAF No. 19). Brandmeyer never saw Mr. Hamilton take any aggressive action toward Manney; instead, she saw Mr. Hamilton defend himself from Manney. (SAF No. 20). Ford saw Mr. Hamilton holding the middle of the baton across his chest in a defensive position as if he was trying to protect himself. (RPFF No. 107). Ford's

observations are consistent with what MPD Officer Frederick Schroeder saw when he arrived at the scene after the shooting, which was that Mr. Hamilton was holding the baton across his chest with both hands. (Id.).

4. There is no dispute that Manney struck Dontre Hamilton.

Manney admits that he punched Dontre Hamilton, using the police phrase "focused strikes." (PFF No. 94). Manney also admits that he introduced the wooden baton into the encounter with Mr. Hamilton, and that he struck Mr. Hamilton with the baton. (SAF No. 21; PFF No. 101). Contrary to Manney's claim that he struck Mr. Hamilton with the baton to stop his assaultive actions, witnesses saw Manney grab Mr. Hamilton and strike him with the baton. McKenzie saw Manney holding onto Mr. Hamilton with one arm, and then strike Mr. Hamilton with the baton. (RPFF No. 101). McKenzie saw Manney strike the left side of Mr. Hamilton's body with the baton about four to five times. (Id.). Thomas also saw Manney grab Mr. Hamilton and start hitting Mr. Hamilton with the baton. (Id.).

5. There is a dispute as to whether Dontre Hamilton bit Manney.

The Defendants claim that Dontre Hamilton "bit" Manney. (Defendants' Brief at p.39). Manney contradicts this claim, because he does not know whether the wound on his hand was caused by Mr. Hamilton biting his thumb or by the punches he delivered to Mr. Hamilton's mouth or teeth. (SAF No. 22).

6. There is a dispute as to the actions of Dontre Hamilton and Manney immediately prior to the shooting.

The Defendants claim that Dontre Hamilton advanced towards Manney with the baton raised in the air, and ignored Manney's orders to stop just prior to

Manney shooting Mr. Hamilton. (Defendants' Brief at p.36). Witnesses to the incident contradict this claim.

With respect to Mr. Hamilton allegedly advancing on Manney with the baton raised in the air, Ford never saw Mr. Hamilton with the police baton raised in the air in a threatening manner. (RPFF No. 107). McKenzie saw Mr. Hamilton with the wooden baton raised above his head – not in a striking position – but waving it back and forth so that Manney could not get the wooden baton back. (RPFF No. 118). Brandmeyer did not see Dontre Hamilton advance towards Manney prior to the shooting. (RPFF No. 117). With respect to Manney allegedly ordering Mr. Hamilton to stop prior to shooting, McKenzie stated that Manney pushed away from Dontre Hamilton and immediately started shooting. (RPFF No. 116). McKenzie did not hear Manney say anything to Mr. Hamilton prior to shooting him, such as tell Mr. Hamilton to stop or to drop the wooden baton. (Id.). Instead, Ford heard Manney say "so you want to fight" seconds before he started shooting Mr. Hamilton. (Id.).

> 7. There is a dispute of fact as to Dontre Hamilton's actions while Manney was shooting him.

The Defendants claim that Manney kept shooting at Dontre Hamilton until Mr. Hamilton was no longer a threat. (PFF Nos. 122-124). They make this claim even though Manney cannot account for 8 or 9 gunshots that he fired at Mr. Hamilton. (RPFF No. 121). And as discussed in detail above, there are several witnesses who saw or heard Manney keep shooting while Mr. Hamilton was either on the ground or falling to the ground, and several who saw or heard Manney keep shooting after Mr. Hamilton had dropped the baton and was not advancing.

Because a reasonable jury could find that Manney used excessive force against Dontre Hamilton after Mr. Hamilton was not a threat, and because there are disputes of material fact pertaining to Manney's use of force against Mr. Hamilton, the Court should deny the Defendants' motion for summary judgment on the Plaintiffs' excessive force claim.

**IV. Summary Judgment is Inappropriate on the Question of Whether Manney's Unlawful Detention and Unreasonable Pat-Down Search Were a Cause of Dontre Hamilton's Death.**

   A. A reasonable jury could find that Manney's unlawful detention and pat-down search were a cause of Dontre Hamilton's death.

The Defendants argue that, if Manney's detention and pat-down search were unlawful, these actions did not cause Dontre Hamilton's death due to either intervening events and/or a superseding cause. (Defendants' Brief at pp.36-39). Manney and Flynn contradict this argument. Manney's version of events does not mention intervening events. Instead, Manney claims that the events "rapidly unfolded, and they were continuous." (PFF No. 125). With respect to any alleged superseding cause, Flynn stated that he fired Manney in part because there was a causal link between Manney's pat-down search and the loss of Mr. Hamilton's life. (SAF No. 23).

   B. There are numerous disputes of material fact with respect to the incident between Manney and Dontre Hamilton.

As set forth in detail above, there are numerous disputes of material fact pertaining to Manney's detention, search and use of force against Dontre Hamilton. The same factual disputes that preclude summary judgment on the Plaintiffs'

claims also preclude summary judgment on the question of whether Manney's detention and search of Mr. Hamilton were a cause of his death.

## V. Summary Judgment is Inappropriate on the Question of Qualified Immunity.

Government officials such as police officers are entitled to qualified immunity only if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Bakalis v. Golembeski*, 35 F.3d 318, 322-323 (7th Cir. 1994). Disputes of material fact preclude summary judgment on the grounds of qualified immunity. *Bakalis*, 35 F.3d at 326-327.

### A. There are numerous disputes of material fact that preclude summary judgment on the grounds of qualified immunity.

As set forth above, there are numerous disputes of material fact that preclude summary judgment on the Plaintiffs' claims of unlawful detention, unreasonable search and excessive force. These same factual disputes also preclude summary judgment on the grounds of qualified immunity. *See Bakalis*, 35 F.3d at 326-327.

### B. Manney knew that he was violating Dontre Hamilton's clearly established rights.

As also set forth above, when the facts are construed in the light most favorable to the Plaintiffs, a reasonable jury could find that: (1) Manney unlawfully detained Dontre Hamilton because he lacked reasonable suspicion that Mr. Hamilton had or was about to commit a crime; (2) Manney conducted an unreasonable pat-down search of Mr. Hamilton because he lacked reasonable suspicion that Mr. Hamilton was armed and dangerous and (3) Manney used excessive force against Mr. Hamilton. The right to be free from unlawful detentions

and unreasonable pat-down searches under the Fourth Amendment has been established since 1968. *Terry*, 392 U.S. at 21-27. The right be free from excessive force under the Fourth Amendment has been established since 1985. *Garner*, 471 U.S. at 7. Mr. Hamilton's rights were therefore clearly established when Manney violated those rights on April 30, 2014.

## VI. Summary Judgment is Inappropriate on the Plaintiffs' Failure to Train Claim.

To prevail on their claim against the City for failure to train, the Plaintiffs must establish: (a) the City's training program was not adequate to train its police officers, such as Manney, to properly handle recurring situations; (b) the City knew that more or different training was needed to avoid likely unlawful detentions, unreasonable searches and uses of excessive force, or that this was obvious to the City; and (c) the City's failure to provide adequate training caused the violations of Dontre Hamilton's rights. *See* Federal Civil Jury Instructions of the Seventh Circuit Instruction 7.21.

### A. A reasonable jury could find in favor of the Plaintiffs on their failure to train claim.

#### 1. The City's training program was inadequate to train Manney on the recurring situation of encountering persons with mental illness.

The City has agreed that, prior to and on April 30, 2014, encountering persons with mental illness was a recurring situation that MPD officers such as Manney face. (SAF Nos. 24-25). Accordingly, the only question is whether the City's training program, prior to April 30, 2014, was adequate to train Manney on encountering persons with mental illness. When the facts are construed in the light

most favorable to the Plaintiffs, a reasonable jury could find that adequate training for encountering persons with mental illness requires Crisis Intervention Team ("CIT") training.

Beginning in 2005, the City knew of the importance of CIT training. The City knew that one of the purposes of CIT training was for MPD officers to better respond to persons with mental health crises, and to keep both citizens and officers safe. (SAF No. 26). The City also knew of the de-escalation skills part of CIT training, where police officers learn to approach a person in mental health crisis as a friend offering help, not as a police officer. (SAF No. 27). In addition, the City knew that part of CIT training included scenarios and role-playing, where police officers participate in confronting persons with mental illness, whether or not in crisis. (SAF No. 28).

The Plaintiffs have also retained an expert, Douglas A. Smith, M.D., as an expert on CIT training. (SAF No. 29). Dr. Smith prepared a report setting forth his opinions on the importance of CIT training, and how the City's failure to provide Manney with CIT training caused the violations of Dontre Hamilton's constitutional rights. (SAF No. 30).

>   2.  The City knew that CIT training was required to avoid likely unlawful detentions, unreasonable searches and uses of excessive force, or that this was obvious to the City.

The City knew by 2005 that one of the purposes of CIT training was to reduce incidents of excessive force by MPD officers. (SAF No. 31). If the City knew by 2005 that one of the purposes of CIT training was to prevent the constitutional violation

of excessive force, it was obvious to the City by 2005 that the purposes of CIT training also included the prevention of other constitutional violations, such as unlawful detentions and unreasonable searches. (*See* id.).

> 3. The City's failure to provide CIT training to Manney caused the violations of Dontre Hamilton's rights.

Manney never received any specialized training from the MPD on dealing with mentally ill persons. (RPFF No. 25). Specifically, Manney never received any CIT training from the MPD. (Id.). When he arrived at Red Arrow Park, Manney correctly identified Dontre Hamilton as a person suffering from mental illness. (PFF No. 31) Due to his lack of CIT training, Manney was not prepared to respond to a person with mental illness such as Mr. Hamilton, to keep both himself and Mr. Hamilton safe. (*See* SAF No. 49). In addition, Manney was not given the training to reduce the likelihood that he would unlawfully detain, unreasonably search and use excessive force against Mr. Hamilton, a person he identified as possibly suffering from mental illness. (*See* SAF No. 31). As a result, Manney treated Mr. Hamilton as a criminal suspect rather than a person with mental illness, by detaining, searching and killing Mr. Hamilton.

The fact that the City's failure to provide Manney with CIT training caused the violations of Dontre Hamilton's rights is best demonstrated by contrasting Manney's response to Mr. Hamilton with a CIT-trained officer's response. Manney's encounter with Mr. Hamilton occurred sometime after 3:25 PM on April 30, 2014. (PFF No. 5). Prior to Manney's encounter, MPD Officers Robert Fitchett ("Fitchett" and Andrew Fuerte ("Fuerte") interacted with Mr. Hamilton. (SAF Nos. 32, 34-35).

Fitchett had received CIT training, and was the field training officer for Fuerte. (SAF Nos. 32-33). Fuerte approached Mr. Hamilton, and asked him: (a) if he needed anything; (b) for his identification; and (c) to stand up. (SAF No. 36). Mr. Hamilton stood up, provided his identification and responded that he did not need any help. (SAF No. 37). Mr. Hamilton was "very cordial" during his interaction with Fitchett and Fuerte. (SAF No. 38). After determining that Mr. Hamilton was not bothering anyone or creating a disturbance, Fitchett and Fuerte permitted Mr. Hamilton to remain in Red Arrow Park because he was not doing anything illegal and was just a gentleman lying in a county park. (SAF No. 39). Fitchett and Fuerte then returned to their MPD squad car and drove away from the park. (SAF No. 40).

Shortly after driving away from Red Arrow Park, due to another call to the MPD non-emergency number by a Starbucks' employee, Fitchett and Fuerte received a call from an MPD dispatcher asking if they were still at the park, which they were not, so they returned to the park. (SAF No. 41). When they returned to the park, Fuerte went back to speak to Dontre Hamilton, and Fitchett went to speak with the Starbucks' employees. (SAF No. 42). Fitchett asked Kraemer whether Mr. Hamilton was causing a disturbance, and she replied that Mr. Hamilton was not causing a disturbance. (SAF No. 43). Fitchett told Kraemer that Mr. Hamilton had the right to be in the park, and that Mr. Hamilton was not doing anything wrong or illegal by lying in the park. (SAF No. 44).

Thus, when a CIT-trained MPD officer interacted with Dontre Hamilton, no constitutional violations were committed, and Mr. Hamilton remained alive at the

end of the interaction. By contrast, when Manney interacted with Mr. Hamilton, three constitutional violations were committed and Mr. Hamilton died.

   B.  **The City's alleged compliance with State of Wisconsin training standards is not an absolute defense to the Plaintiffs' failure to train claim.**

Relying upon *Tapia v. City of* Greenwood, 965 F.2d 336 (7th Cir. 1992), the City seems to argue that the Plaintiffs' failure to train claim cannot succeed because the City complies with State of Wisconsin standards on training. (Defendants' Brief at pp.45-49). The City's reliance upon *Tapia* for this argument is misplaced. In *Tapia*, the court of appeals held that the Plaintiff failed to establish that the City of Greenwood's training was inadequate. 965 F.2d at 339. In so holding, the court of appeals determined that the Plaintiff did not offer any evidence that the City of Greenwood failed to comply with State of Indiana training standards, or that other parts of the City of Greenwood's training was deficient. *Id.* There is no holding in *Tapia*, however, that compliance with state training standards is an absolute defense to a failure to train claim. *Id.* As set forth above, Plaintiffs do not allege that the City failed to comply with State of Wisconsin training standards. Instead, the City failed to provide Manney with CIT training so that he could respond to persons with mental illness, despite knowing that responding to such persons was a recurring situation that Manney would face.

Because a reasonable jury could find that the City's failure to provide Manney with CIT training caused Dontre Hamilton's death, the Court should deny the Defendants' motion for summary judgment on the Plaintiffs' failure to train claim.

## CONCLUSION

For the reasons set forth above, the Court should deny the Defendants' motion for summary judgment.

Case 2:16-cv-00507-JPS   Filed 03/03/17   Page 30 of 31   Document 58

Date:   March 3, 2017                  */s/Jeffrey D. Patza*
Jonathan S. Safran
Jerome A. Konkel
Jeffrey D. Patza
SAMSTER, KONKEL, & SAFRAN, S.C.
Attorneys for Plaintiffs
1110 North Old World Third Street
Suite 405
Milwaukee, WI 53203
Phone:       (414)224-0400
E-mail:  jsafran@skslawyers.com
Email:  jkonkel@skslawyers.com
Email:  jpatza@skslawyers.com

Alex Flynn
ALEX FLYNN & ASSOCIATES, S.C.
Attorneys for Plaintiffs
1223 North Prospect Avenue
Milwaukee, WI 53202
Phone:       (414) 276-7400
E-mail:     alex@alexflynn.com

Ian Wallach
LAW OFFICES OF IAN WALLACH, P.C.
Attorneys for Plaintiffs
11400 West Olympic Boulevard
Suite 1500
Los Angeles, CA 90064
Phone:       (213) 375-0000
E-mail:  iwallach@wallachlegal.com

Jovan Blacknell
LAW OFFICE OF J. BLACKNELL
Attorneys for Plaintiffs
200 Corporate Pointe, Suite 495
Culver City, CA 90305
Phone:       (310) 469-9117
E-mail:  Jovan@fight4justice.com