# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

J.M. and
ESTATE OF DONTRE HAMILTON,

                Plaintiffs,

v.

CITY OF MILWAUKEE and
CHRISTOPHER E. MANNEY,

                Defendants.

Case No. 16-CV-507-JPS

**ORDER**

## 1.    INTRODUCTION

This litigation arises from the death of Dontre Hamilton ("Hamilton") on April 30, 2014. On that date, Hamilton was shot and killed by Defendant Christopher E. Manney ("Manney"), an officer with the Milwaukee Police Department ("MPD"), after a physical altercation between the two. Plaintiffs, Hamilton's estate and his surviving minor child, filed suit against Manney and the City of Milwaukee (the "City") on April 27, 2016. (Docket #1).

On February 1, 2017, the parties each filed motions for summary judgment. (Plaintiffs, Docket #45; Defendants, Docket #48). As of March 15 and March 17, 2017, each respective motion became ripe for decision. *See* (Briefing on Plaintiffs' motion, Docket #56 and #75; Briefing on Defendants' motion, Docket #78 and #88). As Plaintiffs' motion is narrower than Defendants', the Court will address it first. The Court discusses the facts relevant to the respective motions separately, to ensure that the proper standard of review is preserved for each.

## 2.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides the mechanism for seeking summary judgment. Rule 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). Internal inconsistencies in a witness's testimony "create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). The non-movant "need not match the movant witness for witness, nor persuade the court that [their] case is convincing, [they] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

## 3.    PLAINTIFFS' MOTION

Plaintiffs seek judgment on their second cause of action, which asserts that Manney unreasonably searched Hamilton in the course of events preceding his death. (Docket #1 at 38).

### 3.1    Relevant Facts

The operative facts of Plaintiffs' motion are largely undisputed; the parties' disagreement is chiefly legal. On October 15, 2014, Milwaukee Chief of Police Edward A. Flynn ("Flynn") fired Manney for "failure to have reasonable suspicion prior to conducting a pat-down search," and "failure to adhere to training and procedures regarding Use of Force considerations." (Docket #49-1 at 1). That same day, Flynn filed a complaint with the Milwaukee Board of Fire and Police Commissioners ("FPC") regarding Manney's discharge.[1] The complaint stated, *inter alia*, that Manney "failed to adhere to [department policy on pat-down searches] when he failed to have reasonable suspicion that [Hamilton] was armed with a weapon and posed a threat to him or others prior to conducting a pat-down search, and acted

---

[1] All facts are drawn from Defendants' response to Plaintiffs' statement of facts (Docket #55) unless otherwise noted. Depending on whether a fact has been genuinely disputed, the Court may rely on Plaintiffs' fact, Defendants' response, or a combination thereof.

contrary to training he received on February 22, 2012, specific to the engagement of homeless individuals." (Docket #49-2 at 4).[2]

Manney appealed his discharge on October 17, 2014. The FPC held a hearing on the matter spanning from March 19 to March 23, 2015. Plaintiffs state that the FPC hearing "was essentially a court trial between Manney and the MPD." (Docket #55 at 11). Defendants maintain that there were differences between the hearing and a standard trial, including that the commissioners were entitled to ask questions of witnesses, and that the matter was based on an appeal of a disciplinary order and was conducted according to procedures mandated by state law. *Id.* at 11-12. Defendants further assert that the MPD was not a party to the proceeding, but rather it was solely between Manney and Flynn. *Id.*

The hearing officer himself stated that "this process is conducted very much like a court trial." (Docket #49-4 at 6). The hearing proceeded in two phases: first, to determine "whether there was in fact a rule violation" by

---

[2]Plaintiffs' statement of fact on this point is as follows:

> In the Complaint, MPD Chief Flynn presented his conclusion that Manney violated MPD Standard Operating Procedure ("SOP") 085.25 Pat-Down Searches, because Manney "failed to have reasonable suspicion that [Dontre] Hamilton was armed with a weapon and posed a threat to him or others prior to conducting a pat-down search …" (Patza Aff. at ¶4, Exhibit B at pp. 2-4).

(Docket #55 at 2). Defendants "do not dispute that the quoted language can be found on page 4 of the cited complaint." *Id.* They go on, however, to offer a nearly nine-page explanation of why Flynn's complaint "was based upon incorrect and incomplete facts." *Id.* at 2-10. This is not a "concise response" to a statement of fact, as required by this District's Local Rules, nor does it actually dispute the stated fact. *See* Civil L. R. 56(b)(2)(B). Defendants' statements are best left for legal briefs or their own affirmative statements of fact. Defendants present no such statements of fact, but they do argue the point in their legal brief. *See* (Docket #56 at 5-7).

Manney as asserted by Flynn, and second, whether "the discipline [was] appropriate based on the circumstances of what happened and based on Officer Manney's history with the department, his career, his performance, etc." *Id.* at 7-8. Both sides were represented by counsel, gave opening and closing statements, and offered evidence. The parties introduced exhibits and elicited witness testimony on direct and cross examination. Manney himself testified at both phases of the hearing.

The FPC upheld Flynn's action by unanimous written decision on April 28, 2015 (the "FPC Decision"). The FPC Decision posed various "findings of fact" and "conclusions of law" addressing the parties' presentations at the hearing. The FPC agreed with Flynn that Manney lacked reasonable suspicion before conducting a pat-down search of Hamilton. Defendants assert that the FPC Decision relates to compliance with MPD rules, not the Fourth Amendment, and reassert that Flynn and the FPC's decisions were based on incorrect sets of fact. (Docket #55 at 15). The FPC Decision noted that it "must find by a preponderance of the evidence that there is just cause to sustain the charges." (Docket #49-9 at 8). The FPC then applied seven standards mandated by statute to assist in making that determination, and found each standard was met by a preponderance of the evidence. *Id.* at 8-12. Defendants point out that the FPC had additional considerations beyond those seven standards, including the seriousness of Manney's rule violations, Manney's work history, and damage to the public's trust in the MPD. *Id.*

Manney appealed the FPC Decision to the Milwaukee County Circuit Court (the "Circuit Court") in accordance with state law. Manney and the FPC were the parties to the appeal. Both parties filed briefs with the Circuit Court. Manney also filed a petition for writ of certiorari with the Circuit

Court, which was similarly briefed. The Circuit Court issued its decision on both in a combined order on July 22, 2016.

Therein, it described Manney's argument against MPD policy, namely that he felt "it imposes an extra limitation on a police officer's right to conduct a weapons pat-down, a limitation that isn't imposed by the state statute or constitutional law principle that authorize such searches." (Docket #49-12 at 6). MPD policy mandates that to conduct a pat-down search, an officer must believe that 1) the target poses a threat to the officer's safety, and 2) the target possesses weapons. *Id.* at 6. Manney asserted that only the first element was required by the Supreme Court's applicable precedent, *Terry v. Ohio*, 392 U.S. 1 (1968). The Circuit Court disagreed, citing *Terry*'s holdings that an officer must suspect "that the persons with whom he is dealing may be armed and presently dangerous." *Id.* at 30. It further found that Wisconsin law is consistent with *Terry*. (Docket #49-12 at 7). The Circuit Court concluded that MPD policy did not conflict with the constitutional prerequisites of a pat-down search, and thus the FPC did not apply an improper legal standard to its decision in that regard. *Id.* at 8.

As to the facts of Manney's appeal, the Circuit Court discussed the parties' vigorous disputes thereof. *Id.* at 9-13. The Circuit Court noted that it was not at liberty "to weigh the evidence anew; the [FPC's] choice of which evidence to accept [or reject] is conclusive." *Id.* at 9-10. It ultimately concluded that the Decision had an adequate factual basis. *Id.* at 13. Manney appealed that order on August 11, 2016, but only as it related to his petition for a writ of certiorari. *See Christopher E. Manney v. Bd. of Fire & Police Comm'rs for the City of Milwaukee*, 2016-AP-1598, Case History, *available at*: https://wscca.wicourts.gov. That appeal is still pending. *Id.*

### 3.2    Analysis

Plaintiffs argue that, in light of the Decision and Manney's unsuccessful appeals thereof (the "Discharge Proceedings"), Manney must be precluded from contesting whether he had reasonable suspicion to conduct a pat-down search of Hamilton. The direct basis for their motion is the Circuit Court's July 22, 2016 judgment and order (the "Judgment"). This Court must give a state court judgment preclusive effect just as it would a federal judgment, and because the Judgment was issued by a Wisconsin court, it must apply Wisconsin's law on preclusion. *See First Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 772 (7th Cir. 2013); *Donald v. Polk County*, 836 F.2d 376, 382 (7th Cir. 1988).

Issue preclusion prevents a party from re-litigating "an identical issue of law or fact in a subsequent action." *Mrozek v. Intra Fin. Corp.*, 699 N.W.2d 54, 61 (Wis. 2005). The doctrine "wards off endless litigation, ensures the stability of judgments, and guards against inconsistent decisions on the same set of facts." *Gentilli v. Bd. of Police & Fire Comm'rs of City of Madison*, 680 N.W.2d 335, 344 (Wis. 2004). There are two requirements for issue preclusion to take effect. First, "the question of fact or law that is sought to be precluded actually must have been litigated in a previous action and be necessary to the judgment." *Id.* Second, the Court must "conduct a fairness analysis to determine whether it is fundamentally fair to employ issue preclusion given the circumstances of the particular case at hand." *Id.* The Court will address

each requirement below, as well as Defendants' other arguments in opposition to Plaintiffs' motion.[3]

### 3.2.1 Actually Litigated and Necessary to the Judgment

The reasonableness of Manney's pat-down search of Hamilton was actually litigated at each stage of the discharge proceedings. An issue is "actually litigated" when "it is 'properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined.'" *In re Estate of Felt*, 647 N.W.2d 373, 376-77 (Wis. Ct. App. 2002) (quoting Restatement (Second) of Judgments § 27 cmt. d (1980)). First, Flynn's discharge order stated directly that Manney's search was unreasonable. Second, after holding an evidentiary hearing on the matter, the FPC found that a preponderance of the evidence supported Flynn's decision. Finally, the Circuit Court's Judgment found that the FPC Decision had an appropriate basis in fact and law. While the propriety of the search was not the only issue addressed in the Discharge Proceedings, it was their primary focus. At each stage of the Discharge Proceedings, the presiding authority expressly decided that Manney's search was unreasonable.

Defendants argue that while the reasonableness of the search was at issue in the Discharge Proceedings, it was assessed in light of Manney's violation of MPD policy. They maintain that none of the decisions held that the search was unreasonable pursuant to constitutional standards.

---

[3]Preliminarily, Plaintiffs argue that they are entitled to use issue preclusion offensively against Manney in this manner. (Docket #46 at 8). They anticipate that Manney will oppose their motion because they were not a party to the disciplinary proceedings. *Id.* Defendants gesture at that position in their factual briefing, (Docket #55 at 11-13), but they have not advanced any supporting legal argument, *see generally* (Docket #56), so the Court treats Plaintiffs' proposition as given. *See Michelle T. by Sumpter v. Crozier*, 495 N.W.2d 327, 335 (Wis. 1993).

Specifically, Defendants contend that the Fourth Amendment reasonableness analysis reviews the totality of the circumstances presented to the officer at the time of the search, while Flynn and the FPC considered subsequent events in arriving at their conclusions. Thus, in Defendants' view, no preclusive effect can attach to the Judgment.

As the Judgment shows, Defendants are incorrect. The Circuit Court held that MPD policy, Wisconsin law founded on *Terry*, and *Terry* itself all held Manney to the same reasonableness standard for his pat-down search. (Docket #49-12 at 6-8). Based on that uniform standard, the Circuit Court went on to affirm the FCP's determination that the search was unreasonable. *Id.* at 9-13. Though this was admittedly based on a deferential standard of review, that does not change the fact that the reasonableness issue was actually litigated in line with *Terry* and the Fourth Amendment.

The Court further notes that it must focus on the Judgment itself, as issue preclusion may only attach to a judgment. *See Mrozek*, 699 N.W.2d at 61 ("In order for issue preclusion to be a potential limit on subsequent litigation, the [issue] actually must have been litigated in a previous action and be necessary to the **judgment**.") (emphasis added).[4] Defendants barely mention the document, instead leveling criticism at Flynn and the FPC for applying an improper legal standard. Even assuming their focus on Flynn and the FPC was correct, it is meritless. The Seventh Circuit recently articulated the *Terry* standard as simply "requiring the officer to hold a reasonable suspicion that the subject is 'armed and dangerous[.]'" *United States v. Williams*, 731 F.3d

---

[4]The posture of preclusion is curious in this case, because the "trial" of the Discharge Proceedings actually occurred in the FPC hearing. A court judgment is necessary for preclusion to attach, and that was issued in Manney's "appeal." Nevertheless, as discussed below, Defendants do not argue that this unusual setting renders issue preclusion inapplicable.

678, 686 (7th Cir. 2013) (quoting *Terry*, 392 U.S. at 27). Flynn's discharge order nearly parroted that language. The FPC decision applied the MPD policy, which as already noted matched *Terry*'s rule. (Docket #49-9 at 10) ("The policy allows for a pat-down for weapons if the [officer] believes the suspect has weapons and poses a threat to the [officer's] or another person's safety.").

No decisionmaker in the Discharge Proceedings considered post-incident events in evaluating Manney's compliance with this standard. At his deposition in this matter, Flynn consistently testified that Hamilton's death was a factor bearing on punishment, not Manney's reasonable suspicion (or lack thereof). (Docket #61-6 at 35:15-36:5) ("Also, you know, this may come up otherwise, but every officer who is found not to've had articulable suspicion is not subject to firing. In the code of conduct we have also has in it aggravating and mitigating factors. And one of the most significant aggravating factors is the ultimate degree of harm that arose from your error. . . . [T]he degree of harm was a loss of life."); *see also id.* at 143:5-10 ("Given the fact that, ultimately, the degree of harm was death, that's why the punishment was termination."). Similarly, the FPC Decision limits its discussion of post-incident events to evaluating whether Flynn's decision to terminate Manney was appropriate. (Docket #49-9 at 11-12).[5] Finally, the Judgment separated its analysis on Manney's reasonable suspicion and the propriety of his discharge. (Docket #49-12 at 9-13, 19-21).

---

[5]The FPC apparently wished to ward off Defendants' argument, concluding its Decision by stating: "It should be noted that we have taken special care to guard against 'hindsight bias' and have focused on what Manney stated he knew and observed at the time of the incident." (Docket #49-9 at 12). Though the comment appears at the end of FPC Decision, it seems primarily addressed at the reasonable suspicion analysis.

At all stages of the Discharge Proceedings, then, the same pat-down search standard was applied to Manney's conduct. To the extent Defendants continue to argue that the standard was wrong, or that it was incorrectly applied to Manney, this is precisely what issue preclusion is meant to prevent.[6] The issue was essential to the Judgment and the rest of the Discharge Proceedings and cannot be re-litigated here. Similarly, Defendants cannot re-litigate the facts upon which Flynn's discharge order, the FPC decision, or the Judgment itself were based. Their time to argue that the "totality of the circumstances" favored Manney was in those proceedings.

### 3.2.2 Fundamental Fairness

Having established that the reasonableness of Manney's search was actually litigated in the Discharge Proceedings and was necessary to the Judgment, the Court moves to the *Mrozek* fairness analysis. Wisconsin courts weigh a number of factors in assessing fairness, including:

> (1) whether the party against whom preclusion is sought could have obtained review of the judgment;

> (2) whether the question is one of law that involves two distinct claims or intervening contextual shifts in the law;

> (3) whether there are apt to be significant differences in the quality or extensiveness of the two proceedings such that relitigation of the issue is warranted;

> (4) whether the burden of persuasion has shifted such that the party seeking preclusion had a lower burden of persuasion in

---

[6]Manney's position in the Discharge Proceedings was that the second requirement of the MPD policy, a belief that a suspect is armed, is imaginary. (Docket #55 at 17-18). Defendants' current position is that it is not a proper statement of constitutional law. They maintain that *Terry* requires a suspicion that a suspect *may* be armed, not a suspicion that a suspect *is* armed. (Docket #55 at 18-19).

the first trial than in the second; and

> (5) whether matters of public policy or individual circumstances would render the application of issue preclusion fundamentally unfair, including whether the party against whom preclusion is sought had an inadequate opportunity or incentive to obtain a full and fair adjudication of the issue in the initial litigation.

*Mrozek*, 699 N.W.2d at 61-62. Factors one, two, and four are questions of law, and factors three and five require exercise of the Court's discretion. *Id.* at 62.

As to the first factor, Manney has exhausted all review of the Discharge Proceedings. His appeal to the Circuit Court, and the resulting Judgment, are the final say on the matter pursuant to the governing Wisconsin statutes. Wis. Stat. § 62.13(5)(b) (allowing Flynn to file charges against Manney), (d)-(em) (establishing FPC hearing procedure), and (I) (permitting appeal to the Circuit Court, stating that "[i]f the order of the [FPC] is sustained it shall be final and conclusive."). Manney has utilized all levels of review available to him.

Defendants counter that Manney is in fact appealing the Judgment. As noted previously, this matter is currently pending in the Wisconsin Court of Appeals. Yet Defendants' position obscures the nature of the appeal. When Manney took the Discharge Proceedings to the Circuit Court, he filed two actions, one for review of the FPC Decision pursuant to the above-cited Wisconsin statute, and another for a writ of certiorari. *See* (Statutory Review, Case No. 2015-CV-3881, Docket #49-10; Writ, Case No. 2015-CV-5081, Docket #49-11). The Circuit Court consolidated the cases for purposes of issuing its Judgment. His currently pending appeal is of the denial of certiorari, not of the Circuit Court's affirmance of the FPC Decision. (Docket #57-5 at 1, 10)

(citing the writ action case number, and introducing the appeal as "a Certiorari appeal").

The *Gentilli* case is instructive, where a similar scenario unfolded. Gentilli, a fire department employee, was charged with possessing and using cocaine by the fire chief. *Gentilli*, 680 N.W.2d at 337. The charges were heard by the FPC, which confirmed the charges and recommended firing him. *Id.* Gentilli then filed two parallel cases in the circuit court, as did Manney: one for his statutory appeal, pursuant to Section 62.13(5)(I), and one for a writ of certiorari. *Id.* The circuit court ruled on the statutory appeal first and concluded, as did our Circuit Court, that the discharge was supported by just cause. *Id.* at 337-38. The circuit court then dismissed the certiorari action because "all of the issues raised in the petition were encompassed within the scope of the companion statutory appeal." *Id.* (quotation marks omitted). Gentilli appealed the dismissal of his certiorari action. *Id.*

The *Gentilli* court cited Section 62.13(5)(I) in holding that the circuit court's disposition of the statutory appeal was final and not subject to further review. *Id.* at 338-39. The court's main purpose was to determine whether a separate certiorari action was permitted in light of the 1993 amendments to the statutory action procedure (holding that it was allowable). *Id.* at 339-45. Relevant to our purposes, the court went on to find that in the case of parallel statutory and certiorari actions, an appeal of the certiorari action is strictly limited to whether the FPC "kept within its jurisdiction and proceeded on a correct theory of the law." *Id.* at 344. As confirmed late last year, this means that when parallel actions are pursued, and the statutory appeal fails in the circuit court, the employee cannot re-argue whether he violated the applicable departmental rules on certiorari appeal. *Vidmar v. Milwaukee City Bd. of Fire Police Comm'rs*, 889 N.W.2d 443, 449 (Wis. Ct. App. 2016); *see also*

*Umhoefer v. Police and Fire Comm'n of City of Mequon*, 552 N.W.2d 412, 415-16 n.4 (Wis. Ct. App. 2002) ("Umhoefer filed both a statutory review pursuant to Wis. Stat. § 62.13(5)(I) and a certiorari review before the circuit court. However, this court is limited to those issues brought under certiorari review . . . . [I]f a circuit court sustains the commission's determination, the commission's decision 'shall be final and conclusive.' Thus, this court is without jurisdiction to review Umhoefer's claims brought pursuant to § 62.13(5).").

Manney's pending appeal, then, is quite limited, and he cannot use it to challenge the FPC's or Circuit Court's determination that he lacked reasonable suspicion to search Hamilton. Defendants might have contended that the remaining avenues to challenge the FPC Decision, jurisdiction and applying an incorrect theory of law, work to keep the question unsettled. Plaintiffs attempt to head this argument off at the pass, stating in their opening brief that the FPC's jurisdiction is not subject to challenge (as noted above, it is provided by statute), and that the "theory of law" at issue is whether Manney was properly discharged, not whether his search of Hamilton was reasonable. Defendants make no attempt to respond to these points; their entire argument is to cite to Manney's appellate briefs in the certiorari action, wherein he contends that "the FPC proceeded on incorrect theories of law and that he was denied Due Process of law, and that therefore, the decisions of the circuit court and the FPC should be reversed in all respects." (Docket #56 at 2). Such an underdeveloped position, which fails to meaningfully address Plaintiffs' contentions, is at best unpersuasive, and at worst concedes the point. *See Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (failing to present an argument to the district court may result in the argument being waived or, in the case of a plaintiff, the relevant

claim being deemed abandoned). In light of Defendants' lacking argument, the finality of the statutory appeal, and the interaction of the statutory and certiorari appeals, the Court finds that Manney's pending appeal does not affect the finality of the Judgment with respect to the reasonableness of his search.

Returning to the fairness factors, the second factor has already been resolved. The law applied in the Discharge Proceedings was both internally consistent and in accordance with Supreme Court precedent. *See supra* Part 3.2.1. The third factor also favors Plaintiffs. The FPC hearing had all the makings of a court trial and gave Manney a forum to present his case nearly identical to that which he would receive in this Court. Likewise, his appeal to the Circuit Court functioned similarly to an appeal from a trial court. Other than passing references to potential inadequacies in their response to Plaintiffs' statement of facts, (Docket #55 at 11-12), Defendants raise little concern with the quality or extensiveness of the Discharge Proceedings. The Court must conclude that Defendants' lack of opposition is a tacit agreement that the Discharge Proceedings afforded Manney adequate process.

Defendants do, however, note one difference between the Discharge Proceedings and normal civil litigation: the qualified immunity defense. Manney asserts the defense here, where he could not in the Discharge Proceedings. This observation, while true, is of no moment. As discussed below, Manney is not entitled to qualified immunity at this juncture. *See infra* Part 4.2.5. The facts describe a violation of Hamilton's constitutional right to be free of a suspicionless search, and that right was clearly established by *Terry* nearly fifty years ago.

Defendants do not mention the fourth factor. Again, without opposition, the Court finds that it favors Plaintiffs. Plaintiffs' burden of proof

in this Court is no greater than that imposed on Flynn in the Discharge Proceedings. Plaintiffs must prove that Manney's search was unreasonable by a preponderance of the evidence. Seventh Circuit Pattern Civil Jury Instruction 1.27. After its hearing, the FPC was bound to assess whether there was "just cause" for Manney's discharge. Wis. Stat. § 62.13(5)(em). One of the seven standards it applied (*see supra* pg. 5) was "[w]hether [Flynn] discovered substantial evidence that the [Manney] violated the [MPD search policy]." *Id.* The Court concludes that the need for "substantial" evidence was at least as burdensome as establishing the unreasonableness of the search as "more probably true than not true." Seventh Circuit Pattern Civil Jury Instruction 1.27.

As to the fifth factor, neither public policy nor Manney's circumstances make the application of issue preclusion unfair in this instance. *Gentilli* explained the policy basis for making Manney's statutory appeal final at the circuit court level:

> The public policy undergirding the finality of the statutory appeal is to balance the benefits of a speedy judicial process against the right of an accused to mount a full defense. Finality limits the negative effects on public employees of long, drawn-out proceedings while allowing the accused a fair hearing.

*Gentilli*, 680 N.W.2d at 339. The FPC hearing gave Manney a fair hearing, allowing him to mount his defense as he chose (save for qualified immunity). His incentive to fully and fairly litigate the reasonableness of his search could scarcely have been greater, as he was seeking to continue his thirteen-year career as a police officer and absolve himself of serious charges.

In sum, it is fundamentally fair to apply issue preclusion on the reasonableness of Manney's search of Hamilton. That issue was fully litigated

in the Discharge Proceedings and was resolved against Manney in a final judgment. Allowing Manney to re-litigate the issue here threatens inconsistency between the Judgment and the outcome of Plaintiffs' unreasonable search claim in this case.

### 3.2.3   Subsequent Remedial Measure

Defendants' only remaining argument is that the entirety of the Discharge Proceedings are inadmissible in this matter as a subsequent remedial measure. Federal Rule of Evidence ("FRE") 407 prohibits admission of evidence of "measures [ ] taken that would have made an earlier injury or harm less likely to occur" to prove negligence or culpable conduct: in this case, using the Discharge Proceedings to prove the unreasonableness of Manney's search. Fed. R. Evid. 407. Defendants' theory fails for misapprehension of the "remedial measure" at issue. Plaintiffs' request for issue preclusion is based the Discharge Proceeding findings that Manney's search was unreasonable. This is not itself a remedial measure; the remedial measure was Manney's termination.[7]

An excellent explanation of this issue is given by Judge Simon from the District of Oregon. *Aranda v. City of McMinnville*, 942 F.Supp.2d 1096 (D. Ore. 2013). In *Aranda*, the court was faced with a similar scenario: a police department conducted a "use of force review" after an officer allegedly used excessive force on an arrestee. *Id.* at 1100, 1102. The defendants sought to

---

[7]Defendants seem to acknowledge as much: "Clearly, the decision of Chief Flynn to **discharge** Officer Manney from MPD service was a subsequent remedial measure." (Docket #56 at 11) (emphasis added). Additionally, "the actions of the Chief of Police and the FPC in **terminating** Officer Manney's employment was a disciplinary measure taken which would arguably have made Mr. Hamilton's injury or harm less likely to occur." *Id.* at 12. (emphasis added).

strike that evidence from the summary judgment record as violating, *inter alia*, FRE 407. *Id.* at 1102. The court described the applicable law:

> By it terms, this rule is limited to measures that would have made the harm less likely to occur; it does not extend to post-incident investigations into what did occur. "The reason [for finding Rule 407 inapplicable] is that such reports or inspections are not themselves remedial measures, and do not themselves even reflect decisions to take or implement such measures." Christopher Mueller & Laird Kirkpatrick, 2 FEDERAL EVIDENCE § 4:50, at 77 (3d ed. 2007). Although "such reports or inspections might represent the first or most preliminary steps that might eventually lead to decisions to make or implement changes," they are not themselves excluded under Rule 407. *Id.*; *accord Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 429-32 (5th Cir. 2006); *Prentiss & Carlisle Co., Inc. v. Koehring–Waterous Div. of Timberjack, Inc.*, 972 F.2d 6, 10 (1st Cir. 1992) ("The Rule prohibits 'evidence of ... subsequent measures,' not evidence of a party's analysis of its product. . . .The fact that the analysis may often result in remedial measures being taken (as occurred here) does not mean that evidence of the analysis may not be admitted."); *Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron*, 805 F.2d 907, 918-19 (10th Cir. 1986) ("It would strain the spirit of the remedial measure prohibition in Rule 407 to extend its shield to evidence contained in post-event tests or reports. . . .[S]uch tests are conducted for the purpose of investigating the occurrence to discover what might have gone wrong or right. Remedial measures are those actions taken to remedy any flaws or failures indicated by the test.").

County Defendants point out that the Ninth Circuit has applied Rule 407 in an excessive force case to exclude evidence regarding a police department's internal disciplinary proceeding. *See Maddox v. City of L.A.*, 792 F.2d 1408, 1417 (9th Cir. 1986). There is a distinction, however, between the actual disciplining of officers for their conduct, which could constitute a remedial measure, and the investigation that precedes a disciplinary process. *See, e.g., Wilson v. Beebe*, 770 F.2d 578, 590 (6th Cir. 1985) (Rule 407 does not exclude a post-shooting

report prepared by police department because "[t]he report did not recommend a change in procedures following the shooting; it was a report of that incident and nothing more"); *cf. Specht v. Jensen*, 863 F.2d 700, 701–02 (10th Cir. 1988) (citing *Maddox* in applying Rule 407 to city's press release that acknowledged officers had exercised poor judgment and reported that disciplinary action would be taken: "[t]he release thus sets out remedial measures taken by the City to prevent the recurrence of the poor judgment the investigation revealed, and is therefore within the ambit of Rule 407").

*Id.* at 1103-04; *see also In re Chicago Flood Litig.*, No. 93-C-1214, 1995 WL 437501, at *5 (N.D. Ill. July 21, 1995) ("City statements regarding the actions of its employees are not themselves remedial; instead, they merely explain why the city elected to pursue disciplinary action. The court will consider a request by the city to redact references to disciplinary actions taken against particular employees from any statement offered by plaintiffs."); *see Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 430-31 (5th Cir. 2006) ("[B]y themselves, post-accident investigations would not make the event 'less likely to occur;' only the actual implemented changes make it so.").

The Court concurs in *Aranda*'s assessment of FRE 407 in this context. Put another way, the fact that Manney was fired is irrelevant to the reasonableness of his search. The remedial act—firing Manney—is not inextricably intertwined with the investigation leading to that act, namely the determination in the Discharge Proceedings that his search was unreasonable. Flynn and the FPC decided Manney's "liability," that he violated the MPD search policy by unreasonably searching Hamilton, first. They then determined, using post-incident events having no bearing on "liability," that his punishment should be discharge from the MPD. Per the text of FRE 407, Manney's firing "would have made [Hamilton's] injury . . . less likely to

occur," but the individual determination that he lacked reasonable suspicion in this case would not. Fed. R. Evid. 407.

Finally, permitting admission of this evidence comports with the spirit of FRE 407. Its "major purpose is to avoid discouraging injurers from taking such remedial measures as the accident may suggest would be appropriate to reduce the likelihood of future accidents—and discouraged they would be if they were penalized in court by having the measures treated as a confession of fault in not having been taken earlier." *Kaczmarek v. Allied Chem. Corp.*, 836 F.2d 1055, 1060 (7th Cir. 1987). Defendants characterize the issue as "the City of Milwaukee [being] forced to incur civil liability as a direct result of the attempt by Chief Flynn and the FPC to prevent future harm to the public." (Docket #56 at 12). The MPD and the City are not being "penalized in court" for the action that was meant to protect the public from future harm—firing Manney.

### 3.3 Conclusion

In light of the foregoing, Plaintiffs' motion for summary judgment must be granted.

## 4. DEFENDANTS' MOTION

Defendants seek judgment in their favor on each of Plaintiffs' claims and request dismissal of this lawsuit in its entirety.

### 4.1 Relevant Facts

The Court begins with a timeline of the relevant events, and concludes with a discussion of Manney's relevant training and experience. The Court

discusses the parties' disputes where appropriate.[8]

### 4.1.1   Events of April 30, 2014

On April 30, 2014, at about 1:54 p.m., Officers Robert Fitchett ("Fitchett") and Andrew Fuerte ("Fuerte") received a call to conduct a welfare check on someone in Red Arrow Park (the "Park").[9] They discovered Hamilton lying down near the Red Arrow monument. They asked Hamilton to stand up and present identification, and also asked if he needed any help. Hamilton complied and responded that he did not need help. Fitchett and Fuerte found Hamilton to be "very cordial." (Docket #61-12 at 15:14-21). They found that Hamilton was not doing anything illegal or bothering anyone, so they left him alone and departed the Park.

Shortly after driving away, they received a request to return to the Park. A Starbucks employee, working at a store in the Park, had made another call about a person in the Park.[10] The employee in question, Jennifer Kraemer, called the MPD's non-emergency line and did not specifically request for an officer to come. Fuerte went to speak with Hamilton, while Fitchett contacted Kraemer. Kraemer said that Hamilton was not causing a disturbance, though his presence was uncomfortable for her and the store's customers. Fitchett told Kraemer that Hamilton "had the right to be in the

---

[8]As before, unless otherwise noted, these facts are drawn from the parties' statements of fact and responses thereto. *See supra* note 1. The Court also observes that Defendants have offered a "reply" in support of their own statement of facts. (Docket #83). This document is neither contemplated nor permitted by this District's Local Rules. *See* Civil L. R. 56(b)(3). The Court has therefore ignored it.

[9]The Park is less than a half mile northwest of this District's courthouse as the crow files.

[10]The store was temporarily located in a trailer in the Park.

park just as they did. . . . He's not breaking any law." (Docket #61-12 at 18:14-19:16). Fitchett and Fuerte then apparently left the Park again.

Manney, a thirteen-year veteran of the MPD, was also patrolling downtown Milwaukee that day. His patrol area included the Park. At about 3:25 p.m., Manney was finishing a service call and checked his phone for messages. He had a voicemail from desk sergeant Keith Cameron ("Cameron"), who directed Manney to check on an issue in the Park. Cameron's voicemail stated:

> Chris, this is Keith. Just got a call from your people there at the Starbucks at Red Arrow Park. Apparently they have a trailer they're operating out of now. They say there's a homeless guy that's sleeping alongside the trailer there if you want to check on him. Black male, 30 to 40 years old, wearing a blue (unintelligible) or navy coat and navy jeans. And kind of take a peek on him. I'll give it to the dispatcher, too, so it's on the board. Bye.

(Docket #61-2 at 13:17-14:1).

Manney was familiar with that location and the employees who worked there, and he maintains that those employees would only call the police if they felt the situation was concerning for them. Manney had previously responded to calls of disorderly, aggressive homeless persons in the Park. He suspected the same might be true of this situation, and thus described it as a "trouble with suspect" call.[11] Plaintiffs note that Manney had no indication at that time that Hamilton had caused any trouble in the Park, and that accordingly Manney should have characterized the call as a "welfare check." They also cite Kraemer's testimony that she previously heard Manney make a disparaging remark about homeless people, though Defendants

---

[11]Manney's characterization was made to the police dispatcher. (Docket #52 at 3).

maintain that her recollection is not ironclad and the statement probably occurred well before April 30, 2014.

Manney decided to go to the Park. He parked his squad car south of the park and walked north towards the Starbucks trailer. Manney was dressed in his full MPD uniform and was armed with a wooden baton and a semi-automatic pistol. As he approached the trailer, Manney observed Hamilton lying on his back on the concrete pathway. Manney believed the concrete would be a cold surface to lie on given the 50 degree temperature that day, but Plaintiffs deny that he knew whether the concrete was cold. Hamilton was lying on a blanket near the Red Arrow monument in the center of the park. He was flat on his back, save for his left knee being bent upward and twitching, and his palms were open and facing upward. Within arm's reach of Hamilton was a backpack. Hamilton's eyes were closed and Manney assumed he was sleeping.

Given Hamilton's appearance and location, Manney believed he might be homeless. Manney knew that homeless people often have trouble sleeping outside because they are vulnerable to criminals, so they try to sleep in or near businesses to gain some measure of protection. Manney further suspected that Hamilton was suffering from mental illness or the effects of alcohol or drugs, in light of his leg twitch and unusual posture. Manney concluded that Hamilton was likely the person referenced in Cameron's voicemail. Manney characterizes Hamilton's conduct as "disorderly," while Plaintiffs deny he had or was currently engaging in behavior which would violate a disorderly conduct law. Manney counters that sleeping in a public park is a county ordinance violation.

Manney felt it was best to contact the Starbucks employees first. As he approached the trailer, he came within three or four feet of Hamilton's head.

When he did, Hamilton opened his eyes. Manney states that Hamilton had a dazed, unfocused look, while Plaintiffs maintain that Manney had no idea what Hamilton was thinking when he opened his eyes or whether his eyes were focused. Hamilton's reaction caused Manney to again suspect mental illness or the involvement of drugs or alcohol. Plaintiffs deny this, attributing Hamilton's reaction to having been bothered by an MPD officer for the third time in the past hour.

Though Manney did not see Hamilton in crisis or behaving violently, Manney felt he should check on him anyway. Plaintiffs question this desire to "check" on Hamilton, considering that Manney characterized the call as one of "trouble with suspect" rather than as a "welfare check." This characterization came well before Manney had seen any "trouble" from Hamilton. Because Hamilton had opened his eyes, Manney decided to talk with him first, before speaking with the Starbucks employees. Manney thought a conversation might reveal whether Hamilton had a mental health issue or otherwise needed assistance. Manney had previously dealt with homeless people numerous times and often directed them to support services in the community. Plaintiffs again deny that Manney merely wanted to "check" on Hamilton and note that he did not present himself as needing assistance from Manney.

Manney bent over and said "[h]ey partner. Milwaukee police here. You need to stand up. We need to have a quick chat." (Docket #52 at 7). He was still about three feet from Hamilton at the time. Manney claims he was being friendly, though Flynn's later investigation determined that Manney had approached Hamilton as a criminal suspect. Manney admits that his statement was an order to Hamilton to stand up. (Docket #61-3 at 139:3-16). Manney, in any event, believed that his order was lawful. He does not

dispute that he was detaining Hamilton at that point. (Docket #84 at 1). Hamilton then stood up without assistance.

The parties disagree on the next sequence. Manney claims that Hamilton, of his own accord, turned his back on Manney and raised his arms straight out from his sides. To Manney, this suggested that Hamilton was familiar with police contact and pat-down searches. Plaintiffs cite Manney's contrary statement to the Police Administration Bureau given that same day (the "PAB Statement"). As memorialized in an MPD incident report, Manney described that Hamilton stood up and turned away from him. (Docket #61-7 at 4). Manney then approached Hamilton and told him he was going to do a pat-down search. *Id.* Manney reached under Hamilton's arms to raise them and Hamilton apparently did not resist. *Id.* At his deposition, Manney disputed the exact content of the report, but admitted that "technically my arm would have lifted [Hamilton's] a little bit, but it was for me to get my hand so I could pat his chest[.]" (Docket #61-3 at 146:15-152:24). The parties further disagree on whether Manney had reasonable suspicion to search Hamilton, but because that issue has already been resolved in Plaintiffs' favor, the Court will not address their positions in detail.

Manney moved in to complete the pat-down search. He reached his arm around Hamilton, under his arms, to feel Hamilton's right breast and left side near the waistline. Manney felt this contact would show whether Hamilton was tense or his heartbeat was elevated. The touching reveled that neither proposition was true. As he first touched Hamilton, Manney asked Hamilton for his name, and Manney claims he said it was "something like 'Terrell.'" (Docket #52 at 9). Manney says he was attempting to build rapport with Hamilton. Plaintiffs assert that Manney's touching was meant only to complete his desired pat-down search, not build rapport. Further, Hamilton

had provided his true name to other officers earlier that day, so it is unlikely that he intentionally misidentified himself to Manney (whom he did not know); to Plaintiffs, it is more probable that Manney simply misheard Hamilton.

Manney's usual pat-down method was to begin with the person's waistline. Before moving his hands from their locations on Hamilton's chest and side, Manney asked Hamilton if he possessed anything which could injure Manney. He stated words to the effect of ""Hey Terrell, you don't have any knives, needles or guns. . . [.]" *Id.* at 10. Manney states that he could not finish his statement, because at the word "guns," Hamilton brought his arms down, locking Manney's forearms between his arms and torso. This change in behavior surprised Manney. Prior to that point, Hamilton had been cooperative and non-violent.

Hamilton was strong enough to keep Manney's arms pinned. Manney pulled and twisted his body in an effort to free himself. He believes he felt "something hard" in Hamilton's waistline during this struggle, and thought that it might be a gun that Hamilton would reach for. *Id.* at 10. This was later shown to be impossible; Hamilton did not have a gun or "hard" object in his waistline area. Throughout this time, Manney said things like "relax," "stop," "buddy, it's not worth it," and "Milwaukee police, stop." *Id.*

Manney eventually freed his forearms from Hamilton's grasp. Here again the parties' stories diverge. Manney claims that he backed away from Hamilton. According to Manney, Hamilton spun around and advanced toward him, fists clenched. Hamilton's eyes were completely dilated and unblinking. Manney thought Hamilton was about to hit him with his fists. He continued to tell Hamilton to stop while stepping backward. Hamilton did not respond to the commands and looked at Manney with "a thousand yard

stare." *Id.* at 11. Manney felt that Hamilton was looking right through him and did not comprehend what he was being told. Plaintiffs deny Manney's story, citing witness accounts who saw Manney chasing Hamilton in the Park like the two were playing a game. Hamilton was "making a figure eight" and "zigzagging" like a child. (Docket #61-13 at 12:13-20; Docket #61-14 at 72:18-25). They found the situation humorous. (Docket #61-13 at 12:13-20; Docket #61-14 at 7:18-8:3).

Under either approach to events, Manney and Hamilton eventually came back to close physical proximity. Manney claims that Hamilton punched him several times in the head. Plaintiffs counter that Manney denied head trauma at the emergency room immediately after the incident, and photos of his injuries taken at the hospital are not consistent with being repeatedly punched in the head.[12] Further, a witness testified that he saw Manney strike Hamilton first, after Hamilton stopped running away, with his wooden baton. Manney maintains that after Hamilton struck him first, he hit back, though it appeared to have little effect on Hamilton.

Manney pushed Hamilton and backed away. He knew that Hamilton was much stronger than him, given the beginning of the violent portion of their encounter. In Manney's view, he was not confident he could win a fist fight with Hamilton, and needed to get the situation under control, so he retrieved his baton. Plaintiffs again counter that a witness saw Manney strike first and that the evidence does not support Manney's claim of being struck repeatedly by Hamilton.

---

[12]Manney did end up with a wound on his thumb after the incident, which he and the emergency room personnel attributed to a human bite. (Docket #64 at 225:4-226:6; Docket #81-1 at 6). Manney assumes it was Hamilton that bit him, but he did not actually see that happen. (Docket #64 at 225:4-226:6).

The parties' account of events separates for a final time. Manney claims that Hamilton again refused to follow his directions. Manney was forced to hit Hamilton with his baton. Hamilton trapped the baton with his arm and torso and wrenched it out of Manney's hands. Once Hamilton had the baton, Manney punched him again in the jaw, but the strike had no effect. Hamilton then advanced on Manney, striking him with the baton several times in the head and neck. Manney continued to give verbal stop commands to Hamilton which were ignored. Manney was in extreme pain and he felt that one of the strikes actually fractured his skull. He believed that Hamilton was trying to either kill him or inflict great injury. Based on this belief, Manney drew his pistol and again ordered Hamilton to stop. When Hamilton came toward him again with the baton raised, and in fear for his life, Manney fired at Hamilton. Manney claims that he thought he saw bullets hitting Hamilton, but he continued coming forward, so Manney kept firing. He did not stop shooting until Hamilton was no longer a threat, namely, when he was on the ground. Flynn has testified that "if someone's advancing on [an officer] with a weapon that could do you grievous injury, you can keep shooting until they stop advancing on you." (Docket #61-6 at 120:1-3).

Plaintiffs' paint a different picture of the final moments of the encounter. They stress that Manney was still chasing Hamilton when he took out his baton. Witnesses state that Manney held Hamilton and struck him repeatedly with the baton. Plaintiffs admit that Hamilton eventually got the baton away from Manney. However, they again cite Manney's lack of injury to undermine his assertion that Hamilton used it to hit Manney's head. Witnesses variously saw Hamilton holding the baton in a defensive posture,

or they saw him swing it at Manney but the strike failed to connect.[13] Plaintiffs also note that a responding officer, Frederick Schroeder, testified that when he arrived at the scene, Hamilton was on his back, holding the baton across his chest.

As to the shooting itself, the witnesses disagree. One saw Manney push away from Hamilton, then Hamilton took a few steps towards him, and Manney began shooting. At the time, the witness observed Hamilton holding the baton above his head and waving it around, taunting Manney to come get it. Others did not see Hamilton advance on Manney. They agree that Manney and Hamilton were at least ten feet apart when Manney started shooting. They also remember hearing the events differently; one heard nothing from Manney, while another thought he said "[s]o you want to fight?" to Hamilton. (Docket #61-21 at 18:6-8).

Plaintiffs further question Manney's memory those moments. In his affidavit, Manney says he believed he fired five times, but later learned that he had emptied the gun's magazine. (Docket #52 at 14). In his deposition, he and Plaintiffs' counsel argued about his precise memory of each shot. (Docket #61-4 at 228:21-234:2). Witnesses state that Hamilton was either falling or already down while Manney continued firing.[14] Manney believes these

_____

[13]Susan Ford testified that when Hamilton obtained the baton, he held it close to his body, and she "got the impression that he was trying to protect himself." (Docket #61-21 at 17:3-:18:1). She never saw Hamilton raise the baton to threaten Manney. *Id.* at 35:6-8. Larry McKenzie saw Hamilton raise the baton and swing at Manney, but he did not actually see Manney get hit. (Docket #61-13 at 31:11-32:13). Pamela Thomas did not see Hamilton swing the baton. (Docket #61-14 at 62:3-12).

[14]During the shooting, one witness verbalized something to the effect of "[s]top or, you know, [w]hy is [Manney] shooting at [Hamilton]? [Hamilton]'s already on the ground." (Docket #61-25 at 26:18-23). Another heard that witness's exclamation. (Docket #61-26 at 29:7-14).

witnesses were hearing the reverberations of the shots, and they also may have misperceived when the shots were actually occurring because he kept his gun pointed at Hamilton even after he fell. (Docket #61-4 at 230:22-231:10). Finally, Plaintiffs point to Hamilton's autopsy report, which noted that several bullets entered him at a downward angle, suggesting that Hamilton was falling or had fallen by the time of those shots. (Docket #61-30 at 35:15-36:6).

### 4.1.2 Manney's Training

Defendants do not dispute that Flynn and the FPC both set the City's policies with respect to police officer discipline. The City (by its designee) testified that MPD officers regularly encounter people with mental illness or who are in a crisis situation. The City further acknowledged that Crisis Intervention Team ("CIT") training was meant to improve officer responses to such people. Another purpose was to reduce incidents of use of force, and use of excessive force, by MPD officers. CIT training also taught de-escalation skills, which would assist an officer in appearing as a friend to a mentally ill person, rather than as a police officer. Role-playing scenarios are also used to reinforce the principle being taught. The MPD began CIT training in 2005.

In addition to CIT training, the MPD provides training to its officers on, *inter alia*, "defensive and arrest tactics, use of force, encountering people who are mentally ill, encountering people who are in crisis, and encountering people who are homeless." (Docket #59 at 82). MPD officers are also trained on recognizing when subjects have symptoms of mental illness, drug or alcohol dependency, or other disabilities. The MPD instructs that officers are entitled to check on people who appear to have these problems for their welfare and to connect them to appropriate support services. MPD training includes materials published by the Wisconsin Department of Justice Law

Enforcement Standards Board ("WLESB"). Defendants aver that the MPD's training is consistent with WLESB standards.

Manney claims that he received such training. Plaintiffs deny that he received any specialized training on dealing with the mentally ill. He admitted as much in his deposition. Though Manney did receive training on identifying persons in crisis situations, including those with mental illness crises, he cannot recall the content of that training. Manney's only recollection was that the training occurred in 2008 and was taught by a female instructor. Plaintiffs further note that Manney has not received training on various topics related to mental health intervention.[15]

Manney has not received CIT training from the MPD or completed any mental health training using role-playing exercises. Plaintiffs' expert on CIT training, Dr. Douglas Smith ("Smith"), opines that had Manney received such training, the outcome of the Hamilton incident may have been different. *See* (Docket #61-32 at 6). Defendants counter that Karen Dubis ("Dubis"), a former coordinator of the MPD's CIT training, disagrees with Smith's conclusion. *See* (Docket #80). Dubis also states that CIT training is not mandated by the WLESB, and was made available to officers on a voluntary basis.[16]

---

[15]These topics are "(a) emotional labeling; (b) identifying the difference between a person in crisis and a person engaging in criminal behavior, (c) 'cop mode' versus 'social worker mode'; (d) tactical disengagement; (e) active listening skills; (f) de-escalation skills; (g) using a slower approach; and (h) evaluating a person's capacity to understand a police officer's directives." (Docket #59 at 11). Plaintiffs do not state where these terms come from, but the Court assumes these topics would be taught in training sessions that they believe Manney should have had.

[16]Plaintiffs note that Fitchett had received CIT training in 2012. (Docket #61-12 at 8:12-9:21).

Manney further asserts that he received training on dealing with homeless people. Plaintiffs similarly dispute the merits of this training. He was given no specialized training on dealing with homeless people. The entirety of his training on the issue was a ten to fifteen minute presentation where he learned about the MPD's Homeless Outreach Team. The presentation was meant for that team to "say that this is who we are as opposed to actually train." (Docket #61-3 at 54:23-55:1).

With respect to encountering people in the field, MPD officers are trained that they can conduct a *Terry* stop or field interview based on their reasonable suspicion that a person has committed, is committing, or will commit a crime. *See Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt County*, 542 U.S. 177, 185 (2004). The factors they should use to assess that suspicion include the subject's appearance, demeanor, actions, time of day, the appropriateness of their location, whether they are carrying a suspicious item or their clothing has bulges, and their proximity to an alleged crime scene.

MPD officers also receive training on pat-down searches. As noted above, such searches may be conducted if the officer reasonably suspects that they or another person are in danger from the subject. As with *Terry* stops, the officer must also be able to articulate facts leading them to believe that the person is involved in criminal activity. Officers are also trained that consent is a valid basis for a search, provided that it is a "clear and voluntary expression" of consent. (Docket #53-8 at 1).

Regarding use of force, the MPD trains officers to apply their training, experience, and common sense to a situation and respond as events unfold. When subjects become violent, officers are told they have the authority to employ defensive force tactics. Specifically, if the officer is struck by a person, the officer may either respond with the same level of force, or higher if the

officer feels it is necessary for them to gain control of the situation. As relevant here, if an officer is struck with fists, he may either use his fists or draw his baton. Officers are trained that they may only use deadly force when it would be reasonable to prevent great bodily harm or death to themselves or others.

### 4.2 Analysis

At the time the instant summary judgment motions were filed, Plaintiffs advanced the following substantive claims:

1) Unlawful detention,

2) Unreasonable search, and

3) Excessive force, all against Manney; and

4) Failure to train against the City, specifically with respect to encounters with mentally ill people, in violation of the *Monell* doctrine. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978).

(Docket #1 at 37-45 and #43).[17] Defendants seek judgment on each claim. In light of the Court's ruling on Plaintiffs' motion for summary judgment, the second claim is no longer contestable. As to Defendants' remaining requests for judgment, they are doomed by the standard of review, and each must be denied. Defendants have also advanced separate arguments related to the Manney claims, specifically inadequate causation and qualified immunity, but those too must be rejected.

---

[17]Plaintiffs further assert two claims relevant to their damages: loss of society and companionship against Manney, and indemnification against the City pursuant to Wisconsin law. (Docket #1 at 39-40).

### 4.2.1 Unlawful Detention

The Fourth Amendment imposes a limited burden on police officers who wish to briefly detain a person to investigate criminal activity. It requires that the officer have "reasonable suspicion based on articulable facts that a crime is about to be or has been committed." *Williams*, 731 F.3d at 683. Reasonable suspicion is less than the probable cause required to obtain a warrant to seize a person, but more than a mere hunch. *Id.* In analyzing reasonable suspicion, a court "must examine the totality of the circumstances in the situation at hand, in light of the individual officers' own training and experience, and should uphold the stop if it finds that 'the detaining officer ha[d] a "particularized and objective basis" for suspecting legal wrongdoing.'" *Id.* at 683-84 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Viewing the evidence in a light most favorable to Plaintiffs, and making all reasonable inferences in their favor, a reasonable jury could conclude that Manney detained Hamilton without reasonable suspicion that he committed any crime. The information at Manney's disposal which directly concerned Hamilton was limited. Cameron's voicemail described Hamilton's appearance and stated that he was sleeping near the Starbucks trailer. When Manney arrived at the Park, he saw Hamilton lying on a concrete path with his eyes closed, knee bent and twitching. On Manney's way to discuss the matter with the Starbucks employees, Hamilton opened his eyes and the two began their interaction. Manney's first words to Hamilton were an order to stand up, at which point Hamilton's detention began.

Prior to those words, none of the facts available to Manney demonstrated an individualized suspicion connecting Hamilton to a crime.

Defendants contend that Manney could have reasonably believed that Hamilton had been criminally disorderly, based on Kraemer's call, his prior knowledge of the reliability of the Starbucks employees, and Hamilton's appearance and location in the Park. However, Manney had not heard the content of Kraemer's call prior to detaining Manney, nor had he spoken with anyone, such as Cameron, Fitchett, Fuerte, or a Starbucks employee. Thus, any belief in the reliability of Kraemer's complaint was not the individualized suspicion required when police officers seize a person. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). Instead, Manney's only source of suspicion directly related to Hamilton was Cameron's voicemail and Manney's visual observation upon arrival at the Park. Manney admits that the voicemail does not suggest disorderly conduct. (Docket #61-3 at 90:2-6). Defendants do not suggest, and the Court does not find, any suspicion of disorderly conduct from Manney's perception of Hamilton lying down in the Park.

Defendants' factual briefing suggests that Hamilton may have also violated a Milwaukee County ordinance by sleeping in the Park. (Docket #89 at 16-17). This argument fails for three reasons. First, Defendants make no corresponding legal argument in the section of their opening brief dedicated to this issue. (Docket #50 at 26-30). Second, assuming the position was properly presented, Hamilton's conduct did not constitute a crime. *See* Milwaukee County Code of Ordinances §§ 47.25 (prohibiting sleeping in parks) and 47.29 (penalty for violating Chapter 47 ordinances is forfeiture); Wis. Stat. § 939.12 ("A crime is conduct which is prohibited by state law and punishable by fine or imprisonment or both. Conduct punishable only by a

forfeiture is not a crime.").[18] Third, even if Hamilton's slumber could be considered a crime, the facts do not support a reasonable suspicion that Hamilton violated the ordinance. It is true that Cameron's voicemail mentioned Hamilton sleeping and that Hamilton's eyes were closed upon Manney's approach. These facts were not consistent, however, with Manney's other observations. Hamilton's knee twitched while he lay on the ground, and he "awoke" even when Manney attempted to approach quietly.[19] Further, Manney approached Hamilton at midday, not at nighttime. It would thus be less reasonable to assume that Hamilton was sleeping. These facts and circumstances support an inference that Hamilton was not asleep. Given the totality of the circumstances presented to Manney, a reasonable jury could conclude that he lacked appropriate suspicion that Hamilton was sleeping in the Park.

In the alternative to suspicion of disorderly conduct, Defendants posit that Manney's action was not a detention, but instead a mere welfare check pursuant to his "community caretaker" function. Wisconsin recognizes that police officers "may exercise two types of functions: law enforcement functions and community caretaker functions." *State v. Pinkard*, 785 N.W.2d 592, 598 (Wis. 2010) (citing *Cady v. Dombrowski*, 413 U.S. 433, 448 (1973)). Wisconsin maintains an exception to the Fourth Amendment's prohibition on warrantless searches and seizures when a police officer is "serving as a community caretaker to protect persons and property." *Id.* at 597. An officer

---

[18]Defendants do not attempt to counter Plaintiffs' argument on this point in their reply brief. The Court thus treats the matter as conceded.

[19]Manney tried to walk quietly towards the Starbucks trailer, including holding onto his keychain which would otherwise jangle at his waist. (Docket #52 at 5-6).

is a "community caretaker" when he "discovers a member of the public who is in need of assistance." *Id.* at 598. The officer's law enforcement role need not be entirely absent when engaging in community care; to claim the exception, the officer need only "articulate[] an objectively reasonable basis under the totality of the circumstances for the community caretaker function[.]" *State v. Kramer*, 759 N.W.2d 598, 609 (Wis. 2009). If a court finds that the community caretaker function is properly invoked, it balances various considerations to determine whether the police conduct was reasonable. *Id.* at 611.

A reasonable jury could find that Manney was not engaged in a community caretaker function in dealing with Hamilton. As noted above, Hamilton had done nothing unlawful up to the point of his detention. Without knowing that Hamilton had caused any trouble, Manney characterized his intervention in the Park as a "trouble with suspect" call. The jury could potentially infer that this characterization showed preliminary bias against Hamilton, in light of Cameron's mention of a homeless person and Kraemer's recollection of an off-color comment by Manney regarding homeless people. Further, upon contacting Hamilton, Manney did not ask Hamilton how he was doing, but instead immediately ordered him to stand and initiated a pat-down search. This suggests that Manney had not "discover[ed] a member of the public who is in need of assistance." *Pinkard*, 785 N.W.2d at 598.

Construing the facts in Plaintiffs' favor, the Court finds that they do not demand, much less suggest, judgment in Defendants' favor. Whether Manney had reasonable suspicion of unlawful conduct, or whether he was acting as a community caretaker, are disputed factual inquiries which must

be resolved by the jury. Defendants' request for summary judgment on Plaintiffs' unlawful detention claim will be denied.

### 4.2.2 Unreasonable Search

Because Plaintiffs' motion for summary judgment was granted, their unreasonable search claim is no longer disputable. Thus, the Court need not address the related portions of Defendants' motion.

### 4.2.3 Excessive Force

When police officers use force against citizens in carrying out their duties, the Fourth Amendment requires that the force used be reasonable. *Weinmann v. McClone*, 787 F.3d 444, 448-49 (7th Cir. 2015). Reasonableness is a fact-intensive inquiry in light of the totality of the circumstances, including "the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers." *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 472-73 (7th Cir. 2015). The standard also accounts for the fluidity and rapidity of use-of-force situations, and does not permit evaluation of the force used based on hindsight. *Id.* at 473. The Seventh Circuit instructs that "[a]n officer's use of force is unreasonable if in light of all those circumstances at the time of the seizure, the officer used greater force than was reasonably necessary to effectuate the seizure." *Id.* With respect to deadly force in particular, "[t]he Supreme Court further has counseled that it is reasonable for a law enforcement officer to use deadly force if an objectively reasonable officer in the same circumstances would conclude that the suspect posed a threat of death or serious physical injury to the officer or to others." *Marion v. City of Corydon, Ind.*, 559 F.3d 700, 705 (7th Cir. 2009).

Plaintiffs' brief appears to raise two species of excessive force. First, they contend that the entirety of Manney's use of force was unreasonable.

(Docket #88 at 18-23). Second, assuming this was not true, Plaintiffs maintain that Manney applied excessive force when he continued to shoot Hamilton after he was no longer a threat. *Id.* at 16-18.

As to Manney's overall use of force, the facts and inferences in Plaintiffs' favor suggest the following timeline. Manney initiated physical contact with Hamilton in his attempt to complete a pat-down search. Before that time, Hamilton had been non-violent. Hamilton then pinned Manney's arms to his sides and, after a struggle, the two separated. However, rather than turn to face Manney and advance at him menacingly, Hamilton ran away from Manney like a child playing a game, while Manney chased him. The two eventually returned to close quarters. Manney's assertion of head strikes by Hamilton is undermined by his apparent lack of corresponding injury during the emergency room visit later that day. Manney, however, admits that he punched Hamilton. Manney then pulled out his baton. He struck Hamilton repeatedly with the baton until Hamilton pulled it from his hands. Again, though Manney believes Hamilton then hit him with the baton, he did not complain of head trauma at the hospital or bear related injuries. Finally, immediately prior to the shooting, Manney and Hamilton were at least ten feet apart. Hamilton was standing still and either holding the baton in a defensive position across his chest, or waving it in the air playing "keep away" from Manney. Just before he began shooting, Manney said "so you want to fight."

Under this version of the facts, it was unreasonable for Manney to escalate his use of force from fists, to his baton, to his gun. Hamilton's crime, if any, was not serious. Hamilton's only violent act was to trap Manney's arms for a few moments. Afterwards, Hamilton began running away, which did not suggest that he posed an immediate threat to Manney's or another's

safety. In fact, Manney exacerbated the danger by chasing Hamilton and beating him with his fists and baton. Manney's use of deadly force was also unreasonable. At the time he shot Hamilton, the two were ten feet apart. Hamilton was not advancing toward him or threatening him with the baton. This scenario did not present an imminent danger of death or great bodily harm to anyone. While it is true that a suspect's possession of a weapon makes using force more reasonable, the suspect must actually *threaten* someone with the weapon. *See Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003) ("Police may use . . . deadly force if the suspect poses a threat of serious physical harm, either to the officer or to others. [I]f the suspect threatens the officer with a weapon that risk has been established.") (citation and quotations omitted). Though Hamilton had Manney's baton when the shooting started, he did not wield it in a threatening manner.

With respect to the shooting itself, Manney's testimony is not clear regarding how many shots he remembered firing. This calls into question his memory of the entire sequence. Further, Hamilton continued to remain still while being shot, save for falling onto the ground. At least a few of the shots occurred after Hamilton was falling or had already hit the ground. An officer cannot continue to apply deadly force once the threat of harm has passed. *Scott v. Edinburg*, 346 F.3d 752, 757 (7th Cir. 2003). Any shots which occurred during or after Hamilton's fall would violate that rule and remove Manney's privilege to use deadly force.

Of course, the jury may not find these precise facts upon their review of the evidence and witness testimony. In particular, almost all of the witnesses not only contradict each other in some manner, but even contradict their own prior statements (including Manney himself). The wide gulf

between the parties' sequence of events on April 30, 2014 is for the jury to resolve, not the Court.

In fact, Defendants' arguments reinforce rather than detract from these disputes. In their reply briefing, Defendants cite a number of witness accounts which support various aspects of Manney's story. (Docket #78 at 11-18). They also question the reliability of the witness testimony cited by Plaintiffs. *Id.* Initially, the Court notes that Defendants' statement of facts never mentions these witnesses, instead relying almost entirely on Manney's affidavit testimony. Thus, Defendants should be precluded from raising that evidence now. *See Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913-14 (7th Cir. 2011); *Kenall Mfg. Co. v. H.E. Williams, Inc.*, No. 09-C-1284, 2012 WL 4434370 at *3 (N.D. Ill. Sept. 24, 2012) ("[A]rguments and evidence that could have been raised in the opening brief but are first raised in a reply brief are generally deemed waived.") (citing *Judge v. Quinn*, 612 F.3d 537, 542 (7th Cir. 2010)).[20] Assuming that testimony was properly presented, it cannot simply override the contrary testimony and evidence. The Court is prohibited from weighing evidence or deciding which witnesses to believe and which witnesses not to believe. Plaintiffs have raised sufficient evidence to create jury questions on their excessive force claim, and Defendants' motion must be denied on this point.

---

[20]The Court assumes Defendants' good faith, namely that this was not an intentional ploy designed to deny Plaintiffs an opportunity to respond to that testimony. *Citizens Against Ruining the Env't v. E.P.A.*, 535 F.3d 670, 675 (7th Cir. 2008) ("It is improper for a party to raise new arguments in a reply because it does not give an adversary adequate opportunity to respond."). If that were not the case, such conduct might warrant denial of Defendants' request for judgment on this issue at the outset.

### 4.2.4 Causation

Defendants maintain that the unlawful stop and pat-down search did not cause Hamilton's death, and without a causal link to the harm alleged, those claims must be dismissed. Like any civil action, those pursued under Section 1983 require a plaintiff to show causation. *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012). Causation is further divided into two elements: 1) but-for causation, "*i.e.*, the injury would not have occurred absent the conduct," and 2) proximate causation, "*i.e.*, the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Id.*

Defendants' argument goes to the second element, proximate cause. The causal chain between an unlawful act and the injury complained-of may be broken by an intervening or superseding cause. *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 615 (7th Cir. 2002). Defendants contend that Hamilton himself was the intervening cause; his attacks on Manney are what precipitated Manney shooting him, not the earlier stop or search. To make this determination, the Court weighs a number of factors, including the nature of the intervening force, whether the resulting harm is different than what was expected prior to the intervention, whether it was normal to expect such intervention, and whether the intervention was wrongful. *See* Restatement (Second) of Torts § 442 (1965).

Courts have found broken causation in scenarios similar to this one. In *Johnson*, a police officer approached a suspect who was "standing in the street, naked, high on PCP, and yelling and flailing his arms." *Johnson v. City of Philadelphia*, 837 F.3d 343, 345 (3rd Cir. 2016). This interaction did not go well; the suspect slammed the officer into multiple cars and hit him in the head. *Id.* at 346-48. When the suspect tried to take the officer's gun, the officer

shot and killed him. *Id.* at 346. The plaintiff argued that the officer caused the suspect's death by unreasonably approaching an obviously disturbed man alone and without attempting to de-escalate the situation. *Id.* at 350-51. The court held that the suspect's "violent, precipitate, and illegal attack on Officer Dempsey severed any causal connection[.] . . . Whatever harms we may expect to ordinarily flow from an officer's failure to await backup when confronted with a mentally disturbed individual, they do not include the inevitability that the officer will be rushed, choked, slammed into vehicles, and forcibly dispossessed of his service weapon." *Id.* at 352; *see also Estate of Sowards v. City of Trenton*, 125 F. App'x 31, 42 (6th Cir. 2005) ("Sowards's own conduct of pointing the handgun toward the officers was the intervening or superseding cause that set in motion the events that ultimately led to his death," not the officers' earlier warrantless entry into his home.); *James v. Chavez*, 511 F. App'x 742, 750 (10th Cir. 2013) (no proximate causation between officers' unlawful entry into the suspect's home and his death, when he attempted to stab an officer who approached him).

Causation is generally a question of fact for the jury to decide. *Shick*, 307 F.3d at 615 ("While generally the issue of proximate cause is a jury question, in extreme circumstances . . . the question of proximate cause is an issue of law properly resolved by a court."); *Gayton v. McCoy*, 593 F.3d 610, 624 (7th. Cir. 2010) (in addressing a claim for deliberate indifference to an inmate's medical needs under the Eighth Amendment, "[p]roximate cause is a question to be decided by a jury, and only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation."). The issue may only be resolved on summary judgment "when there is no evidence from which a jury could reasonably find the required

proximate, causal nexus between the careless act and the resulting injuries." *Johnson*, 837 F.3d at 352.

With these principles in mind, the Court cannot agree with Defendants that no reasonable jury could find causation between Manney's stop and search and Hamilton's death. Here again, Defendants' arguments ignore the standard of review. Under their construction of the facts, Hamilton moved aggressively at Manney, hit him repeatedly with his fists and the baton, and in the final moments of the encounter, appeared to charge at Manney with the baton poised for a potentially deadly blow. Clearly, those circumstances would defeat proximate causation in light of the precedent cited above. However, the Court is constrained to view the facts in Plaintiffs' favor. The timeline of events, described in Part 4.2.3 above, shows that other than clamping his arms down on Manney's and taking the baton away, Hamilton was not aggressive. A jury could conclude that Hamilton's actions were not substantial enough to sever the causal chain between the beginning and end of the encounter.

*Johnson*, cited by Defendants, provides additional and particularly apt instruction for this case. Immediately after determining that proximate causation was broken by the suspect's crazed attack, the court commented on the limitations of its finding:

> Before continuing on, however, we sound a note of caution. The question of proximate causation in this case is made straightforward by the exceptional circumstances presented—namely, a sudden, unexpected attack that instantly forced the officer into a defensive fight for his life. As discussed above, that rupture in the chain of events, coupled with the extraordinary violence of Newsuan's assault, makes the Fourth Amendment reasonableness analysis similarly straightforward. Given the extreme facts of this case, our opinion should not be misread to broadly immunize police officers from Fourth

Amendment liability whenever a mentally disturbed person threatens an officer's physical safety. Depending on the severity and immediacy of the threat and any potential risk to public safety posed by an officer's delayed action, it may be appropriate for an officer to retreat or await backup when encountering a mentally disturbed individual. It may also be appropriate for the officer to attempt to de-escalate an encounter to eliminate the need for force or to reduce the amount of force necessary to control an individual. Nor should it be assumed that mentally disturbed persons are so inherently unpredictable that their reactions will always sever the chain of causation between an officer's initial actions and a subsequent use of force. If a plaintiff produces competent evidence that persons who have certain illnesses or who are under the influence of certain substances are likely to respond to particular police actions in a particular way, that may be sufficient to create a jury issue on causation. And of course, nothing we say today should discourage police departments and municipalities from devising and rigorously enforcing policies to make tragic events like this one less likely. The facts of this case, however, are extraordinary. Whatever the Fourth Amendment requires of officers encountering emotionally or mentally disturbed individuals, it does not oblige an officer to passively endure a life-threatening physical assault, regardless of the assailant's mental state.

*Johnson*, 837 F.3d at 352-53.[21] Plaintiffs' theory, as revealed by their briefing, appears to be that Hamilton's actions were the product of mental illness, and that Manney should have taken the *Johnson* court's advice. Whether to believe that theory lies within the jury's exclusive province.

### 4.2.5   Qualified Immunity

Defendants' final argument in opposition to the claims against Manney is qualified immunity. That doctrine protects government officials

---

[21]The dissent in *Johnson* makes a similar point while disagreeing with the majority's ruling on proximate causation. *Johnson*, 837 F.3d at 354-56.

from civil liability when they perform discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply," says the Supreme Court, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Once the defense is raised, the plaintiff bears the burden to defeat it. *Weinmann*, 787 F.3d at 450.

To defeat an assertion of qualified immunity, the plaintiff must first proffer facts which, if believed, amount to an actual violation of his constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Easterling v. Pollard*, 528 F. App'x 623, 656 (7th Cir. 2013). As discussed above, Plaintiffs have achieved this. Next, the plaintiff must show that the violation of his constitutional rights was "clearly established under applicable law at the time and under the circumstances that the defendant official acted." *Easterling*, 528 F. App'x at 656 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). A right is clearly established when its contours are "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and alterations omitted). Courts should "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). The Supreme Court recently emphasized that courts must not "'define clearly established law at a high level of generality.'" *Id.* (quoting *al–Kidd*, 563 U.S. at 742). The inquiry should be focused on particular conduct undertaken in particular situations. *Id.* Alternatively, the plaintiff may satisfy this element "by showing that the force was so plainly excessive that, as an objective

matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (quotation omitted).

The qualified immunity defense does not protect Manney at this stage of the litigation. As Defendants have done throughout their briefing, they assume albeit incorrectly, that the Court will accept their version of events. The Court must continue to construe the evidence in Plaintiffs' favor when assessing qualified immunity. *Mordi v. Ziegler*, 770 F.3d 1161, 1164 (7th Cir. 2014) ("The court cannot resolve disputed issues of fact when it addresses [whether a constitutional violation occurred] because the ordinary rules governing summary judgment apply in that situation."). In keeping with the most recent authority from the Supreme Court, this Court must apply that construction of the facts to define the relevant constitutional right and tailor it to this case. *See Mullenix*, 136 S. Ct. at 308. Here, this process results in the following questions. Could Manney have reasonably believed that the following were consistent with Hamilton's Fourth Amendment rights:

1)  Detaining Hamilton without reasonable suspicion that he was engaged in disorderly conduct or had otherwise violated a criminal law;

2)  Conducting a pat-down search of Hamilton without reasonable suspicion that he was armed; and

3)  Using deadly force against Hamilton during an encounter where Manney was almost entirely the aggressor and was not, in the final moments before shooting Hamilton, presented with an imminent danger of death or great harm?

The answer to each question is no. Hamilton's right to be free from suspicionless detentions and searches was established by *Terry* nearly fifty

years ago. *Terry*, 392 U.S. at 17-31. As the Seventh Circuit noted in *Williams*, "[i]t is well-established—and has been since long before the shooting at issue here—that a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." *Williams*, 797 F.3d at 484 (citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)). Thus, Manney's use of force was proscribed at least thirty years ago. Though Plaintiffs do not make the argument, Manney's force could also be considered "so plainly excessive that, as an objective matter, [Manney] would have been on notice that [he was] violating the Fourth Amendment." *Findlay*, 722 F.3d at 899.

Given this controlling precedent, and an assessment of the relevant questions in accordance with the standard of review, it was "beyond debate" at the time Manney acted that his conduct violated Hamilton's Fourth Amendment rights. *al-Kidd*, 563 U.S. at 741. After the jury determines the ultimate facts underlying the defense, however, Manney may revisit it.

### 4.2.6 *Monell* Claim

As noted above, only one *Monell* claim remains. As the Supreme Court held in the eponymous case, local government entities, such as municipalities and counties, cannot be held vicariously liable for constitutional violations committed by their employees. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). Such entities can, nevertheless, be liable under Section 1983 if "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v.*

*Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690).

Plaintiffs allege that the City failed to appropriately train its police officers with respect to "recurring situations of encountering individuals suffering from mental illness and/or experiencing a crisis situation[.]" (Docket #43). The City will bear liability for its relevant policies if those policies caused the unconstitutional harm Hamilton suffered, or in other words, if the policies were the "moving force" behind the constitutional violation. *Thomas*, 604 F.3d at 303; *Estate of Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). Causation may be shown directly, "by demonstrating that the policy is itself unconstitutional," or indirectly, for instance when "a plaintiff cannot identify any formal policy that is unconstitutional," by pointing to "a series of bad acts creating an inference that municipal officials were aware of and condoned the misconduct of their employees." *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (quotations omitted).

This Court has further direction on failure-to-train claims in particular. For these *Monell* derivatives, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The *Dunn* court explained:

> Deliberate indifference may be shown in one of two ways. First, a municipality shows deliberate indifference when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation. Second, a municipality shows deliberate indifference if it fails to provide further training after learning of a pattern of constitutional violations by the police.

*Dunn v. City of Elgin, Ill.*, 347 F.3d 641, 646 (7th Cir. 2003) (citations omitted). In other words, "'[i]t may happen that…the need for enhanced training is so obvious, and the inadequacy of training is so likely to result in the violation of constitutional rights, that a jury could reasonably attribute to the policymakers a deliberate indifference to those training needs.'" *Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir. 1992) (quoting *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1298 (7th Cir. 1989)). If that were true, "the failure to offer proper training constitutes a policy for which a city is liable when improper training actually imposes injury." *Id.* Further "[Plaintiffs] must show that the failure to train reflects a conscious choice among alternatives that evinces a deliberate indifference[.]" *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012).

The facts and reasonable inferences therefrom support Plaintiffs' failure-to-train claim at this stage. The City has agreed that encountering mentally ill people is a recurring issue for MPD officers. It further recognized, twelve years ago, that CIT training was an important tool to address that issue, and that one of the purposes of CIT training was to reduce incidents of excessive force. Manney nevertheless did not receive CIT training or any other specialized training on dealing with the mentally ill. In Plaintiffs' view, this lack of training caused Manney to respond inappropriately to Hamilton, escalating the violence of the situation, and ultimately leading to Hamilton's death.

The City's primary opposition to these facts is that its compliance with WLESB training requirements absolves it of any failure-to-train liability.[22] It finds support for this proposition in *Tapia*. There, the plaintiff complained of police officers making a warrantless entry into her home. *Tapia*, 965 F.3d at 337-38. In discovery, she asked for all documents in the defendant municipality's possession on its procedures for warrantless home entries. *Id.* at 339. The defendant responded that there were none, and that its officers were trained in accordance with state law at the police academy. *Id.* The plaintiff emphasized the municipality's lack of training materials at trial and succeeded on her *Monell* claim. *Id.*

The appellate court found that a failure-to-train claim did not lie because the need for further training was not obvious. *Id.* In support, the court cited a number of factors. First, the plaintiff "offered no evidence to indicate that the City failed to adhere to the minimum standards for training police officers under Indiana law." *Id.* Second, she failed to show that the municipality was somehow *required* to have written training materials. *Id.* Third, the municipality offered testimony that its officers were trained on search procedures at state police academies and they received additional training from other sources, including the FBI. *Id.*

The Court does not read *Tapia* as broadly as the City suggests. *Tapia* mentions, in one sentence, that the plaintiff failed to show noncompliance with state training standards. The court then cited further evidence of the officers' training both inside and outside the police academy. Based on this

---

[22]In addition to referencing its mental illness training, the City also cites its training on investigatory stops, pat-down searches, and use of force. *See supra* pg. 32-33. It is not clear how this bears on Plaintiffs' sole remaining *Monell* claim. Plaintiffs do not contend that the City maintained a defective stop, search, or use of force policy which led to Hamilton's death.

evidence, it concluded that the need for further training was not obvious. If *Tapia* had desired to create the blanket immunity the City desired, it could have expressly stated that adherence to state training standards alone supported judgment in the municipality's favor. It did not, and in the fifteen years since *Tapia* was decided, the Court of Appeals has not clarified that *Tapia*'s holding is as the City believes.

The City also argues that causation is lacking. It first cites to Hamilton's "attack" which overrode any connection between Manney's mental illness training and Hamilton's death. Construing the facts in Plaintiffs' favor, a jury could find that no such attack occurred. The City next points to Dubis, its expert on the matter of CIT training, who opines that CIT training would not have made a difference for Manney on April 30, 2014. Her opinion is directly opposed by that of Plaintiffs' expert Dr. Smith. The Court cannot resolve this battle of experts on summary judgment.[23]

The Court finds, then, that Plaintiffs have raised a triable issue as to their *Monell* claim. This ruling is no comment on the strength of that claim. As Defendants point out, Plaintiffs bear a heavy burden to prove the City's alleged deliberate indifference—its intentional or criminally reckless conduct—to the need for more or better training regarding the mentally ill. The burden is made even heavier by the fact that the City considered alternatives to its training regimen on the issue and apparently concluded that the current program was best. (Docket #78 at 21-22). Beyond all this, Plaintiffs must prove that any inadequate training was the moving force behind Hamilton's death. Defendants claim that the April 30, 2014 incident

---

[23]Neither party has formally opposed the admissibility of the other's expert testimony. *See Daubert v. Merrell Doe Pharm., Inc.*, 509 U.S. 579, 597 (1993).

had no obvious connection to mental illness or a "crisis situation," and thus Manney's actions were necessarily divorced from any of his deficient mental illness training. *Id.* at 22-23. All of these questions must be left for the jury to decide.

### 4.3    Conclusion

Distilled to its core, Defendants' motion is defective because it bases nearly all of its assertions on Defendants' version of the facts. The Court is required, however, to take the opposite viewpoint. In accordance with the standard of review, these issues of material fact must await the jury's deliberation and verdict in May of this year.

## 5.    CONCLUSION

In light of the foregoing, Plaintiffs' motion for summary judgment will be granted, and Defendants' will be denied. The Court will further address other housekeeping matters. Defendants' requests to file an overlong reply brief and include certain misplaced exhibits in their reply are belatedly granted. (Docket #76 and #85). The Court has also reviewed the parties' motions related to sealing documents relevant to their summary judgment briefing. (Docket #62 and #87). The motions will be granted and denied in part; the parties agree that exhibits L, N, O, P, Q, and R should be unsealed. (Docket #65, #67, #68, #69, #70, and #71, respectively). All other documents currently filed under seal shall remain so for the time being.[24] The issue of confidentiality will be revisited at trial. Finally, the parties have stipulated

---

[24]Defendants mention that they are also amenable to having unsealed certain portions of Manney's deposition transcript. (Docket #87 at 3-4). The unsealed version which is currently available was redacted by hand. *See* (Docket #61-3, #61-4, and #61-5). To the extent the redactions need to be changed to comply with the parties' agreement, a revised redacted transcript should be submitted without seal.

that Plaintiffs' unredacted responsive briefs, filed on March 27, 2017, may be unsealed. (Stipulation, Docket #90; Plaintiffs' Brief in Opposition, Docket #88; Plaintiffs' Response to Defendants' Statement of Facts, Docket #89). The Court will lift the seal on those documents.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for summary judgment (Docket #45) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (Docket #48) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' motion for leave to file an overlong reply brief (Docket #76) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants' motion for leave to file additional exhibits related to their reply (Docket #85) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiffs' motion to seal (Docket #62) and Defendants' motion to seal (Docket #87) be and the same are hereby **GRANTED in part** and **DENIED in part** in accordance with the terms of this Order; and

**IT IS FURTHER ORDERED** that Plaintiffs' unredacted brief in opposition to Defendants' motion for summary judgment (Docket #88) and response to Defendants' statement of facts (Docket #89) shall be unsealed and made publicly available by the Clerk of the Court.

Dated at Milwaukee, Wisconsin, this 12th day of April, 2017.

BY THE COURT:

_____

J.P. Stadtmueller
U.S. District Judge